365 So.2d 1382 (1978)
William M. BENARD, Plaintiff-Appellee,
v.
BRADLEY AUTOMOTIVE et al., Defendant-Appellant.
No. 13691.
Court of Appeal of Louisiana, Second Circuit.
December 4, 1978.
Neil Martin Trichel, Shreveport, James F. McGovern, Minneapolis, Minn., for defendant-appellant.
Lunn, Irion, Switzer, Johnson & Salley, Shreveport, for plaintiff-appellee.
Before BOLIN, MARVIN and JONES, JJ.
JONES, Judge.
Defendant, Bradley Automotive, a division of Thor Corporation (Bradley is a trade name), and Thor Corporation appeal a judgment rendered against it in favor of the plaintiff, William M. Benard, for $12,960. The amount of the judgment included $9,885, the purchase price of a Bradley GT II sports car, the sale of which was rescinded in the judgment, $400 freight for delivery of the vehicle from Pennsylvania to Shreveport, Louisiana, and $2,675 attorney fees.
Plaintiff answers the appeal seeking an increase in the judgment of $1,500 to cover cost of attorney fees expended on appeal.
We grant an increase in the plaintiff's attorney fees in the amount of $1,000 and as amended, affirm the judgment.
In February of 1977, plaintiff saw a Bradley Automotive advertisement and telephoned *1383 Bradley via a toll free number seeking information on the purchase of a fully assembled Bradley sports car for his daughter. Plaintiff spoke with Mike Carr, the regional sales manager for Bradley, concerning the purchase. Pursuant to this conversation, plaintiff sent a letter[1] to Bradley enclosing a down payment of $750 on the Bradley GT II. Plaintiff specified he wanted all equipment professionally installed and the automobile ready to drive upon receipt in Shreveport.
During the negotiations which preceded plaintiff's letter to Bradley of February 25, he was aware that Bradley was in the business of selling unassembled automobiles. Plaintiff also believed Bradley sold assembled vehicles including the body, engine and chassis. He had received a direct communication from Bradley in the form of a phonagram which provided:
"Bradley Automotive will deliver an all new 1977 VW chassis and engine for as low as $110 per month . . . Performance and handling of a Bradley GT II on all new VW chassis is absolutely outstanding. The value of your GT will approximately double when everything is totally new. Hurry. Call your Bradley salesman today. Toll free 800-328-7141".
Plaintiff testified he advised Carr in their numerous telephone conversations that he was only interested in purchasing a fully assembled Bradley GT II automobile and that Carr advised plaintiff that Bradley would provide him with the vehicle. On April 20 Benard sent one bank money order payable to Bradley Automotive in the amount of $6,085 and another bank money order payable to GAP Imports Inc., a Bradley affiliate, in the amount of $1,100, both in one letter[2] addressed to Bradley. Plaintiff sent these money orders in the manner directed by Carr and in this letter stated "upon receipt of the enclosed, I would appreciate your advising the time table for the completion of my automobile and its subsequent delivery to Shreveport", thereby reiterating his expectation of his receiving a completed Bradley GT II from the defendant.
*1384 On April 29, 1977, plaintiff received a phone call from Carr advising him that Bradley was shipping the pre-assembled GT II and other component parts of the automobile to Bob Ashcraft of Butler, Pennsylvania, who was to assemble the car upon a chassis and instructing plaintiff to send Ashcraft a check for $1,950 to cover the remaining cost of the vehicle. In response to this telephone conversation, plaintiff sent Ashcraft a bank money order for $1,950.
The automobile shipped to Shreveport by Ashcraft arrived on June 2. During the next few days, Benard noticed the following defects: (1) top of the car was bowed down, (2) the wing-type doors and hatchback doors did not fit the door openings, leaving gaps of 1 to ½ inches, the plaintiff attempted to close the door and one of the windows broke out, (3) gaps of 1 to 1¼ inches between the glass and fiberglass body, (4) leather around the gear shift was too loose, (5) when the car was driven over 25 MPH it shimmied and the steering wheel was hard to control, (6) car leaked when it rained, (7) hinges on back glass of car were loose, (8) pull didn't release hatchback door and (9) plaintiff, after having driven the car approximately 15 to 20 miles, started the motor to show it to his son and the motor developed a loud clanging noise and upon inspection, a bolt had become disconnected from the crankshaft and parts of the motor had fallen to the ground.
Plaintiff called the service manager at the Clements Lincoln dealership to look at the car when a part of the motor fell off. The service manager worked on the car two hours before he could drive it to the dealership where it has since been stored and not used.
On June 23, plaintiff telephoned Bradley's custom service department regarding the defects and the evaluation of the condition of the automobile by the Clements service manager. On June 24, Benard received a letter from Peggy Klingenberg, Customer Service Manager of Bradley, listing the repairs needed pursuant to the telephone conversation and stating "we will repair or replace any defects in workmanship or materials". Klingenberg requested plaintiff to call Bradley's toll free number to arrange for Bradley to pick up the automobile. Plaintiff had no further communications with defendant and filed this suit for redhibition on July 20, 1977.
The issues on appeal are: (1) did Bradley sell plaintiff a sports car or only a pre-assembled Bradley GT II exclusive of a VW engine and chassis with the engine having been purchased from a separate Bradley affiliate and the chassis and the total assemblage of the vehicle having been acquired from Ashcraft? (2) is Bradley a good faith seller or a manufacturer who is not entitled to an opportunity to repair as a condition precedent to a suit for redhibition and who is presumed to know the defects in the product sold and therefore liable for attorney fees, expenses of the sale and damages? and (3) did the trial court err by deciding the case before the transcript had been prepared?
Bradley contends it is in the business of selling either a Bradley car kit, which the customer assembles, or a pre-assembled car kit, both of which exclude the Volkswagen engine, Volkswagen chassis and the attachment of the chassis to the Bradley fiberglass body. GAP Imports, a Bradley affiliate, imports and sells Volkswagen engines and chassis. Bradley asserts Bob Ashcraft of Custom Cars is an independent builder of kit cars, who is one of several builders to whom Bradley refers customer who want to buy a completed automobile for assemblage of the Bradley body onto a chassis. Bradley contends there were three separate sales to Benard, one by it for the pre-assembled Bradley GT II, one for the VW engine from GAP imports, and one for the VW chassis and assemblage of the VW chassis and Bradley GT II with Ashcraft's Custom Cars. The Bradley invoice sent to Benard shows the car included a Bradley GT II pre-assembled, wire wheels, tires, air conditioner and AM/FM 8 tract stereo for a total of $6,835. The GAP Imports, Inc. invoice was for one 1977 VW engine for $1,100. Ashcraft's Custom Cars invoice for a Bradley GT II completed was for $1,950 and transportation charge of $400.
Plaintiff testified that he advised Carr that he was unmechanical and that he *1385 wanted to buy a completed automobile and that Carr advised him that was what he could expect. Plaintiff's testimony is corroborated by his letters to Bradley of February 25 and April 20. The fact that he was requested by Carr to send a separate check for the engine payable to GAP Imports and a separate check to Ashcraft for the chassis does not detract from plaintiff's understanding that he was purchasing a completed vehicle from Bradley. The manner in which Bradley put the package together was totally immaterial to plaintiff. Benard had every reason to believe that Bradley was capable and willing to deliver the engine and the chassis along with the other component parts of the car, by virtue of the advertisement he had received following his initial conversation with Carr, hereinabove quoted, wherein Bradley specifically offered to deliver the chassis and engine.
On the trial of this case, the defendant did not offer as a witness its regional sales manager Mike Carr to rebut Benard's testimony that Carr had agreed to deliver him a finished automobile. Defendant's exhibit D-5 contained the original letters from plaintiff of February 25 and April 20, which unequivocally advised Bradley of plaintiff's expectation of a complete automobile from it. Bradley had accepted the checks contained within these letters.
The initial Bradley Automotive order form which was sent to plaintiff and which he returned with the $750 down payment reflected that the VW engine was being provided by Bradley. Ashcraft's invoice entitled Custom Cars, Division of Ramco Enterprise, which plaintiff was first presented on June 2 when the car was delivered, reflected the total charge of $2,350, showing a credit of $1,950 with the balance of $400 being for the freight for delivery of the vehicle from Butler, Pennsylvania to Shreveport, Louisiana. This invoice contains Bradley's logo in the right hand corner of it which was an indication to plaintiff that there was nothing unusual about his making payment for the chassis' final assemblage and freight on his completed vehicle to this company and that such a transaction and payment did not change his initial understanding that he was purchasing from Bradley a completed automobile. At the time plaintiff paid Ashcraft the $1,950, he had already sent Bradley the total sum of $7,935.00 on the purchase price of his GT II and at the time of delivery of his car by Ashcraft Custom Cars and receipt of the invoice, he paid the remaining balance of $400 on the invoice for freight.
Considering the totality of these circumstances, we find that the record supports the trial judge's factual determination that there was a sale by defendant to plaintiff of a completed Bradley GT II vehicle.
Defendant does not deny on appeal that the vehicle is subject to defects, but takes the position that the vehicle as assembled by them, exclusive of the engine and chassis, had no defects at the time it was shipped by it to Ashcraft. This position is of no comfort to it in light of our affirmance of the trial judge's finding that defendant made a sale of the total unit. We, however, observe that the evidence established substantial defects in the body of the vehicle in the form of poor fitting doors, windows and windshield, which created water leaks at all of these points, and danger of infiltration of exhaust fumes through the rear window and hatchback door. The evidence establishes that these defects were in the fiberglass body made and assembled by Bradley. These defects were such as would have justified rescission of the sale of the pre-assembled GT II kit which Bradley contends was the only thing it sold plaintiff. Bradley, as a manufacturer[3] of the pre-assembled kits is presumed to *1386 know the defects and would therefore be liable, not only for the restitution of the price of the pre-assembled GT II kit, but also for repayment of expenses and damages. C.C. Article 2545.[4] Plaintiff's expenses and damages would have included the sums paid by him to GAP Imports and Bob Ashcraft Custom Cars because these expenditures would not have made available to him a functional sports car and therefore would have been a total loss. See Rey v. Cuccia, 298 So.2d 840 (La.1974) where recovery for the installation of a trailer hitch was allowed as damages in connection with the rescission of the sale of a camper trailer. See Radalec, Inc. v. Automatic Firing Corp., 228 La. 116, 81 So.2d 830 (1955) where lost profits, storage and transfer expenses were allowed as damages and expenses in connection with the rescission of the sale of two air conditioning units. See Baughman v. Quality Mobile Homes, Inc., 289 So.2d 376 (La.App. 1st Cir. 1973) where $2,504.58 finance charges, sales taxes and other fees of $935.00 were allowed as damages and expenses in connection with the rescission of the sale of a motor home.
Bradley contends plaintiff cannot rescind the sale according to Article 2531 because Benard did not tender the car to Bradley to repair as requested in Bradley's letter. C.C. Article 2531[5] gives the seller of an automobile who does not know of defects a chance to repair before an action in redhibition can be brought.
As manufacturer, Bradley is presumed to know the defects in the thing. Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978). Therefore, the article applicable to manufacturers is Article 2545, not Article 2531. Ritter v. Leigh & Wiggins, Inc., 337 So.2d 281 (La.App. 2d Cir. 1976).
A purchaser is not required to give a manufacturer a chance to repair before instituting an action in redhibition. Burns v. Lamar-Lane Chevrolet, 354 So.2d 620 (La. App. 1st Cir. 1977).
We find that the trial court properly gave judgment to plaintiff for the purchase price of the sports car, transportation expenses and attorneys' fees. On appeal plaintiff asks for an increase in attorneys' fees of $1,500. We find an increase in attorneys' fees of $1,000 will adequately compensate plaintiff's attorney for services rendered on appeal.
Defendant asserts it was error for the trial court to decide the case before the transcript was prepared. The trial court ordered plaintiff to file post-hearing briefs within ten days, and ordered the defendant to file its brief ten days following the filing of plaintiff's brief. LSA-R.S. 13:4207.1(a) allows the court in an exceptional case, one in which the transcript is deemed essential, to order the transcript prepared within 30 days. Nothing in the record indicates the trial court considered the transcript essential and there was no error in the trial court's refusal to order the transcript prepared *1387 before the briefs were due and before it decided the case.
For the reasons assigned, we award plaintiff additional attorneys' fees in the amount of $1,000 for services of his attorney rendered on appeal, together with seven percent (7%) per annum interest thereon from date of this judgment, and as amended, AFFIRM the judgment of the trial court. Defendant is cast for all costs.
NOTES
[1] February 25, 1977
"Mr. Mike Carr
Regional
Sales Manager
Bradley Automotive
495 Shelard Plaza
400 County Road 18 South
Minneapolis, Minn. 55426
Dear Mike:

I enjoyed talking with you today and in accord with our conversation, am enclosing my check in the amount of $750, which represents the down payment on the Bradley GT II I ordered. It is understood that the car will have the following equipment:
(1) Mag wire wheels
(2) Radial Tires
(3) Four season factory air conditioner
(4) New VW engine
(5) All deluxe assessories, including vent windows
(6) A deluxe AM/FM stereo radio with tape deck
(7) The Bradley GT II executive option group assembled
In other words, I want this car to have the very best equipment you have to offer and I want it professionally installed and ready to drive upon receipt in Shreveport. Upon receipt of the attached check, I would appreciate your confirming and providing me with a list of the equipment which is to be included and installed as part of our arrangement, by return mail.
With best personal regards.
 Yours very truly,
 Bill /s
 W. M. Benard
WMB/cjg"

[2] April 20, 1977
"Mr. Mike Carr
Regional Sales Manager
Bradley Automotive
495 Shelard
400 County Road 18 South
Minneapolis, Minn. 55426
Dear Mike:

In compliance with the telephone call I received this week, I am enclosing a Bank Money Order in the amount of $6,085, representing the balance due you on my Bradley GT II. I am also enclosing a $1,100.00 Bank Money Order payable to G.A.P. Imports to pay in full the cost of the engine and chassis. Upon receipt of the enclosed I would appreciate you advising the time table for the completion of my automobile and it's subsequent delivery to Shreveport.
With best personal regards.
 Yours very truly,
 Bill /s
 W. M. Benard
WMB/cjg
Enclosures"

[3] Bradley contends it is a seller of car kits and not a manufacturer because it buys the component parts from various vendors which are then packaged by Bradley Automotive. Bradley holds itself out as a manufacturer in its sales brochure for the pre-assembled Bradley GT II stating "trained craftsmen in our assembly department precisely fit together every component part, right down to the nuts, bolts, upholstery and gauges. Lastly, the light-weight, rust-proof Bradley fiberglass body is manufactured with precision and care in the universal plant adjoining the center."

The Bradley logo appears on the front of Bradley automobiles. When a seller labels a manufacturer's product as his own, he holds himself out to the public as a manufacturer, and such status is imputed to him. Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La. 1978); Penn v. Inferno Manufacturing Corporation, 199 So.2d 210 (La.App. 1st Cir. 1967); Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972).
[4] C.C. Art. 2545"The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages."
[5] C.C. Article 2531"The seller who knew not the vices of the thing is only bound to repair, remedy or correct the vices as provided in Article 2521, or if he be unable or fails to repair, remedy or correct the vice, then he must restore the purchase price, and reimburse the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, subject to credit for the value of any fruits or use which the purchaser has drawn from it.

In any case in which the seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding and similar right of action against the manufacturer of the thing for any losses sustained by the seller, and further provided that any provision of any franchise or manufacturer-seller contract or agreement attempting to limit, diminish or prevent such recoupment by the seller shall not be given any force or effect."