628 F.2d 395
 Roy MELANCON, Plaintiff-Appellant,
v.
WESTERN AUTO SUPPLY CO. et al., Defendants-Third Party
Plaintiffs-Appellees-Appellants,
v.
M.T.D. PRODUCTS et al., Third Party Defendants-Appellees-Appellants.
BRIGGS & STRATTON, Third Party Defendant-Fourth Party
Plaintiff-Appellee,
v.
Lillian D. MELANCON, Fourth Party Defendant-Appellant.
 No. 79-1425
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 15, 1980.
 Robert B. Keaty, New Orleans, La., for plaintiff-appellant.
 Pugh & Boudreaux, Nicholls Pugh, Jr., Lafayette, La., for defendants.
 Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Edward C. Abell, Jr., Lafayette, La., for M.T.D. Products.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before HILL, GARZA and THOMAS A. CLARK, Circuit Judges.
 THOMAS A. CLARK, Circuit Judge:
 
 
 1
 This products liability case was brought by the plaintiff-appellant, Roy Melancon, to recover damages for personal injuries suffered by him when he was set afire as his wife started their gasoline-powered rotary lawn mower. Melancon appeals from the district court's grant of a directed verdict in favor of the defendants at the close of the plaintiff's case. After a thorough review of the record, we have determined that the district court erred in granting the directed verdict. Accordingly, we reverse and remand the case for a new trial.
 
 
 2
 The lawn mower which is the focal point of this action was purchased by Roy Melancon and his wife Lillian from defendant-appellee Western Auto Supply Co. ("Western Auto"). The mower was sold under Western Auto's trade name "Wizard." The mower's engine, including its muffler, had been manufactured by defendant Briggs & Stratton Engine Company, Inc. ("Briggs & Stratton").[1] The mower itself was manufactured by defendant-appellee M.T.D. Products, Inc. ("M.T.D.").
 
 
 3
 The facts can be summarized briefly. The Melancons had used their "Wizard" mower for approximately two years to cut the lawn surrounding their home in Kaplan, Louisiana. On the morning of July 30, 1976, Mrs. Melancon used the mower for several hours. Apparently not having completed her lawn mowing task and with the mower out of gasoline, Mrs. Melancon placed the mower in the shade around noon and took a break for lunch. Sometime after lunch Mrs. Melancon proceeded to refuel the lawn mower. She used a gas can which had a flexible funnel to fill the mower's gasoline tank. It was undisputed at trial that Mrs. Melancon did not spill any gasoline on or near the mower as the tank was filled. Mrs. Melancon then set the gas can about ten feet away and attempted to start the mower by pulling the crank rope. Twice the mower would not start.
 
 
 4
 Noticing that his wife was encountering some difficulty in starting the mower, Roy Melancon approached the mower from the side opposite from where Mrs. Melancon was pulling the starter rope. Roy Melancon alleged that as he stood some two to three feet away from the mower, but directly in line with the mower's exhaust muffler, his wife successfully started the mower and a flame shot out from the muffler and set his trousers on fire. Before the fire was extinguished Mr. Melancon had suffered third-degree burns over approximately 75% of his body.
 
 
 5
 At trial Mr. Melancon attempted to prove that the muffler on the mower had been defectively designed and began to malfunction shortly after the mower was purchased from Western Auto. He testified that the muffler had emitted sparks when the mower was in operation. Through the testimony of plaintiff's expert witness, Bertram I. Strauss, the plaintiff sought to establish that an "envelope" of gasoline fumes had formed around the mower when the refueling of the gas tank displaced the fumes present in the empty tank. Thus, according to the appellant, the accident was caused by the combination of the invisible fuel envelope and the defective "A-type" or "wiener"-shaped muffler which created a "flamethrower" or "blowtorch" effect when the mower was started.
 
 
 6
 In granting the defendants' motion for directed verdict, the trial court held that the lawn mower in question was not defective when it left the manufacturer. Furthermore, recognizing that under Louisiana law a manufacturer of a product is under a duty to warn users of its product when a potential danger is known to the manufacturer but such danger "cannot justifiably be expected to be within the knowledge of users generally," Chappuis v. Sears Roebuck and Co., 358 So.2d 926, 930 (La.1978), the trial court ruled that the potential danger here was "obvious" to Melancon. Thus, the defendants were not under a duty to warn, and Western Auto and M.T.D. could not be held liable to Melancon.
 
 
 7
 In determining if the appellant proffered sufficient evidence to warrant submission of the case to the jury on the question of whether the lawn mower presented a potential danger which was not obvious, we are obliged to apply the standard announced by this court sitting en banc in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969):
 
 
 8
 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence-not just that evidence which supports the non-mover's case-but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side had the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 9
 411 F.2d at 374-5 (footnote omitted).
 
 
 10
 We have carefully reviewed the record before us on appeal, "in the light and with all reasonable inferences most favorable" to Mr. Melancon, the party opposed to the motions. Our review leaves us convinced that there was more here than a "mere scintilla" of evidence in support of the appellant's case. Indeed, we feel that there was "substantial evidence" put forth at trial over which "reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."
 
 
 11
 Specifically, we disagree with the trial court's conclusion that the danger created by the combination of a spark-emitting muffler and an invisible "fuel envelope" is, or should be, obvious to a typical user of the type of lawn mower owned and used by the Melancons. Appellant's witness, Bertram Strauss, an expert in the field of lawn mower safety, provided extensive testimony on how, in his opinion, the potential danger developed and how it could have been avoided. He testified that when a lawn mower tank is filled, the gasoline fumes already in the tank will be displaced as the tank fills with gasoline. According to Strauss these fumes, because they are heavier than air, tend to envelop the lawn mower.
 
 
 12
 Strauss also testified at length that the combination of the stream of the hot exhaust with the fuel envelope could result in what he termed the "Venturi effect." Basically, the Venturi effect would result in the formation of a partial vacuum around the rapidly moving flow of exhaust from the lawn mower's muffler. This vacuum would serve to "pull" or suck the fuel envelope into the exhaust stream where it could be ignited by sparks passing through the muffler. Thus, a blowtorch or flamethrower effect would occur until presumably all of the gasoline fumes subject to the Venturi effect had been ignited. In addition, Strauss testified that the lawn mower industry is aware that a fuel envelope may form when a mower is refueled, creating the potential for fire or explosion if a source of ignition is present. He further testified that in his opinion the average consumer does not appreciate the potential danger of refueling a mower when the muffler needs to be replaced because it is emitting sparks.
 
 
 13
 The expert's testimony was that the potential danger caused by the combination of a fuel envelope and a deteriorated muffler could be prevented in one of four ways. (1) The manufacturer could install a better muffler that was more resistant to corrosion and designed to last as long as the mower itself; (2) a metal deflector could be used with the "A-type" or "wiener"-type muffler to turn the flow of exhaust, including any sparks, toward the ground and away from the mower operator and any bystanders; (3) the manufacturer could design the mower so that the muffler/exhaust system was underneath the rotary blade housing and the exhaust flow was directed at the ground; or (4) the manufacturer should warn consumers that worn out mufflers are more than just a noise nuisance and should be replaced immediately because of the potential danger of fire or explosion. Here, there was no warning either in the owner's manual or on the "Wizard" mower itself that worn out mufflers should be replaced because their continued use could result in serious injury.
 
 
 14
 In an opinion authored by our brother judge, then Justice, Albert Tate, Jr., the Supreme Court of Louisiana outlined the scope of a manufacturer's liability under Louisiana law for injuries caused by the use of its products:
 
 
 15
 A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. (Emphasis added.)
 
 
 16
 Weber v. Fidelity & Casualty Insurance Co. of New York, 259 La. 599, 250 So.2d 754, 755 (1971). Furthermore, if a plaintiff proves that he was injured by a product "unreasonably dangerous to normal use," the manufacturer may be held liable without proof of defective design or manufacture of the product. Chappuis v. Sears Roebuck & Co., supra.
 
 
 17
 In Chappuis, the plaintiff had been injured when a steel fragment from the hammer he was using struck one of his eyes. Apparently, the face or "ball" or "crown" of the hammer head had been damaged or chipped prior the the accident in which Chappuis was injured. Chappuis sued the retailer from which he had purchased the hammer, the manufacturer of the hammer, and an insurer. Although there was ample evidence that neither the design nor manufacture of the hammer had been defective, expert witnesses testified that the manufacturer knew that once the face of a hammer is chipped it becomes unsafe to use because it probably will chip again. Therefore, the dangerous hammer should be discarded. Although a label on the hammer warned of the dangers of using the hammer other than for its intended use of driving and pulling common nails, there was no warning that the hammer was dangerous to use once its face had been chipped. The court found that the injured plaintiff did not know and could not reasonably have been expected to know of the danger of using the chipped hammer.
 
 
 18
 The Supreme Court of Louisiana concluded "that such a hammer, placed in commerce without a warning that it must be discarded when chipped, is unreasonably dangerous to normal use." Chappuis v. Sears Roebuck & Co., 358 So.2d, at 929. Furthermore, when a manufacturer knows that a product may become dangerous for normal use in certain conditions and that danger "cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user." Id., at 930.
 
 
 19
 We think that Strauss's testimony was evidence of sufficient quality and weight to support Melancon's theory that the lawn mower was either defective in its design of the exhaust system or unreasonably dangerous to normal use in that the defendants knew or should have known that the mower's muffler could create a blowtorch effect when a fuel envelope is present as the mower is started. Unlike the trial court, this court does not think that the danger of the combination of a deteriorated lawn mower muffler and an envelope of gasoline fumes is clearly obvious to the typical mower user. The obviousness of this potential danger was for the jury to determine. While we acknowledge the trial court's view that Melancon should have been aware of the danger of gasoline fumes because the manufacturer in its owner's manual had cautioned against refueling the mower indoors, we do not think this warning necessarily renders the potential danger of refueling the mower outdoors "obvious."
 
 
 20
 Therefore, in light of the testimony of appellant's expert witness, it was error for the trial court to direct a verdict for the defendants and to dismiss the cross-actions of Western Auto and M.T.D. against each other and their third-party complaints against Briggs & Stratton. We do not pass judgment on the merits of the appellant's case. We simply hold that the record reveals sufficient evidence to withstand a motion for directed verdict. We note that since no appeal was taken from the district court's dismissal of all third-party demands against Lillian Melancon, that part of the district court's order is not subject to our review and will not be disturbed. Therefore, we affirm the district court's dismissal of all third-party actions against Lillian Melancon, reverse the district court's directed verdict for the appellees and its dismissal of the remaining third-party actions, and remand for a new trial.
 
 
 21
 AFFIRMED in part, REVERSED in part, and REMANDED for a new trial.
 
 
 
 [1]
 Prior to trial, Briggs & Stratton settled with Melancon and was dismissed as a named defendant. However, Briggs & Stratton remained as a third-party defendant below and is an appellee on the appeal by Western Auto, Western Auto's insurer, Travelers Insurance Co., and M.T.D. Products, Inc., of the lower court's dismissal of all third-party actions