426 So.2d 262 (1983)
Patricia Ford O'BRIEN, et al.
v.
DELTA GAS, INC., et al.
No. 13278.
Court of Appeal of Louisiana, Fourth Circuit.
January 10, 1983.
Rehearing Denied February 24, 1983.
*264 Gauthier, Murphy, Sherman, McCabe & Chehardy, Wendell H. Gauthier, Robert M. Murphy, Kenner, William A. Glennon, New Orleans, for plaintiffs-appellees.
Johnston & Duplass, Robert M. Johnston, Stassi & Rausch, Joseph W. Rausch, New Orleans, for defendants-appellants.
Before GULOTTA, WARD and CIACCIO, JJ.
GULOTTA, Judge.
Defendant, NGO Chemical Division of Helmerich & Payne, Inc. (NGO), appeals from a jury award exceeding $3.1 million to plaintiffsfour adults and two children for injuries from a residential gas explosion. We amend and affirm.
The explosion on May 29, 1977, in a rented dwelling in Empire, Louisiana, injured plaintiffs, Rose and Glenn Fisher, Lawrence Latour, and Patricia O'Brien, and seriously injured her two young children, Brenda (age 7) and Timothy O'Brien (age 4), after an unsuspecting Mrs. Fisher lit a match while unaware that odorless natural gas *265 had entered the residence through an uncapped gas line. The escaping gas was not detected because distillates or contaminants in the line had "masked" the odor of the chemical manufactured by NGO and added by Delta Gas, Inc. (Delta), the gas supplier, as a warning odorant.
Plaintiffs sued Mrs. Louise Hingle (lessor), Delta (supplier of the gas) and NGO (manufacturer of the odorant). NGO third partied Delta. Plaintiffs' claims against Delta and its insurers were settled,[1] and the matter went to trial on the main demands against the lessor and NGO, and on NGO's third party demand against Delta.
Concluding that a defect in NGO's additive and the negligence of the lessor, Delta and NGO had proximately caused the injuries, the jury awarded Brenda and Timothy O'Brien $1.5 million each, Patricia O'Brien and Lawrence Latour $50,000.00 each, and Glenn and Rose Fisher $25,000.00 each. It further found NGO was not entitled to reimbursement from Delta.
Because of plaintiffs' pre-trial release of Delta, the trial judge reduced the awards by one-third and rendered judgment in favor of plaintiffs and against Mrs. Hingle and NGO.[2] He further dismissed NGO's third party demand against Delta. Mrs. Hingle has not appealed, and the judgment is now final as to her.
Appealing, NGO complains of the following errors: 1) improper allotment of peremptory challenges on voir dire; 2) erroneous admission into evidence of NGO's odorant sales brochure; 3) improper jury instructions; 4) manifest error in the jury's findings that NGO was negligent and its product defective; 5) erroneous denial of NGO's exception of prescription; and, 6) excessiveness of the verdicts.
Delta has filed a motion to dismiss NGO's appeal, which we now consider before turning to the merits of NGO's contentions.

MOTION TO DISMISS
Delta moves to dismiss NGO's timely filed appeal "to the limited extent of the third party demand against Delta...." Delta claims NGO's appellate brief only addresses errors relating to plaintiffs' principal demands and raises no objections concerning the trial court's dismissal of NGO's third party claim against Delta. In support of its motion, Delta cites Rule IX-A of the former appellate court rules, now embodied in Rule 1-3 of the Uniform Rules, Courts of Appeal, effective July 1, 1982, which provides this court "... will review only issues which were submitted to the trial court and which are contained in the specifications or assignments of error, unless the interest of justice clearly requires otherwise."
The rule relied on by Delta concerns the scope of our review, not the appellant's *266 right to appeal. Rules 1-3 and 2-12.4[3] merely provide that this court, in its discretion, may consider as abandoned any unbriefed specification or assignment of error; they do not authorize the dismissal of a timely filed appeal. Further, because the issues in the main and third party demands are so closely related, we do not deem any issues abandoned.
Accordingly, the motion is denied.

PEREMPTORY CHALLENGES
The trial judge allowed six peremptory challenges to plaintiffs, six to NGO, and six to Delta. According to NGO, because of the pre-trial settlement between Delta and plaintiffs (whereby Delta acquired an interest in plaintiffs' recovery) these parties had "identical" interests and were only entitled to share six challenges between them instead of receiving six challenges each. We disagree.
The trial judge was confronted with a "three-sided" case. Delta's pre-trial settlement agreement specifically provided it was not to be construed as an admission of Delta's liability. Although admittedly free from financial liability in this litigation, it was in Delta's interest to protect its business interests and public relations from the harmful effect of a finding of fault as a gas distributor. Thus, despite the pre-trial settlement, Delta remained adverse to plaintiffs.
Further, in response to NGO's plea of prescription, plaintiffs urged that Delta and NGO were solidarily liable and that the timely filing of the suit and service of process on Delta interrupted prescription as to NGO. Under these circumstances, plaintiffs bore the burden of showing that Delta and NGO were joint tortfeasors, and thus remained opposed to Delta. It is also noteworthy that the agreement of partial reimbursement to Delta was made only by Mr. Latour and the O'Briens, and not the remaining two plaintiffs, Rose and Glenn Fisher.
NGO, of course, was adverse to all plaintiffs and Delta. Clearly, all the litigants had contradictory interests in establishing or negating liability.
Under the circumstances, we find no error in the trial court's allocation of peremptory challenges.[4] See LSA-C.C.P. Art. 1764.[5]

ADMISSIBILITY OF EVIDENCE
Over NGO's objection, plaintiffs introduced into evidence a copy of an odorant sales brochure, "NGO's Captan Manual, the Whif of Life", distributed by NGO to gas companies to promote NGO's expertise as an odorant manufacturer. NGO contends the brochure was irrelevant and prejudicial because it was published two years after the accident and had never been distributed to Delta.
Plaintiffs' cause of action against NGO rests on claims of defects in the odorant, NGO's sale of an improper type of odorant to Delta for its particular system, and NGO's failure to warn Delta that the presence of distillates in the gas lines could render the odorizing properties of the product ineffective. Clearly, the information in NGO's sales brochure about the chemical properties of the odorant and NGO's manufacturing history, expertise, and readiness to assist its customers in solving their odorant *267 "problems" was germane to plaintiffs' cause of action. We conclude, therefore, the publication was relevant to the issues in this case.
Notwithstanding the pamphlet was published two years after the accident and never distributed to Delta, it sets forth company policies that existed prior to the accident. Moreover, NGO's claims of expertise in the brochure mirror the company's motto on invoices and drums of the odorant sent to Delta: "ODORANT SPECIALISTS TO THE GAS INDUSTRY". Under these circumstances, we conclude the brochure was properly admitted in evidence.
Accordingly, we find no error in the trial court's ruling.

JURY INSTRUCTIONS
We further find no merit to NGO's argument that the trial judge committed reversible error in his jury instructions.
Initially, we note that NGO made only a "blanket" objection to the charges in the trial court,[6] instead of a specific one stating the grounds of the objection as required by LSA-C.C.P. Art. 1793.[7] See Caldwell v. Parker, 340 So.2d 695 (La.App. 4th Cir. 1976), writ denied 342 So.2d 1120 (La.1977); Dixie Life Ins. v. Pacific Mut. Life Ins., 416 So.2d 139 (La.App. 4th Cir.1982). Nonetheless, rather than view the objection as waived, we consider NGO's contentions on the merits.
We reject NGO's claim that the trial judge improperly instructed the jury that each party, including NGO, had the burden of proving its case by a preponderance of the evidence.[8] The questioned charge is not an erroneous statement of law in the context of NGO's third-party claim against Delta. At the start of his instructions, the judge made it clear that NGO had raised a third-party claim against Delta seeking reimbursement by Delta for damages NGO might be ordered to pay plaintiffs. Later, the trial judge specifically noted that NGO had the burden of proof concerning Delta's alleged misuse of the odorant. The court's instructions were thus a proper statement of the law concerning NGO's burden of proof as third-party plaintiff. NGO has no standing to complain of errors concerning Delta's burden of proof.
NGO further complains the trial judge erred in charging that NGO was subject to LSA-R.S. 33:4522, which requires gas distributors to malodorize gas.[9] After *268 reading this charge, the judge stated: "In a moment I will tell you the standards which apply to defendant NGO's conduct in this particular suit..." The judge then went on to state properly the standards applicable to a manufacturer of products.[10] Although we agree that reference to LSA-R.S. 33:4522, vis a vis NGO, may have been confusing to the jury, the erroneous reference was clarified by the judge's instruction on the standards applicable to a manufacturer. Furthermore, the response to the interrogatories is supportive that the jury was not confused and made findings based on the evidence in this record. If indeed the charge was erroneous, it was harmlessly so.
Finally, we find no error in the judge's failure to give NGO's requested charges on NGO's duty to warn Delta, Delta's status as a knowledgeable purchaser, and Delta's duties to malodorize and sample the gas and to exercise extraordinary care in handling dangerous products. The substance of these charges was covered in the judge's instructions on Delta's possible misuse.[11] Under the circumstances, we find no prejudice to NGO from the jury instructions.

MANIFEST ERROR
It is undisputed that contaminants or distillates in Delta's gas line caused "fading" or "masking" of NGO's odorant resulting in no warning to plaintiffs of the danger of explosion. The primary issue before the jury, however, was whether this loss in odor resulted from the acts or omissions of Delta or NGO, or a defect in the odorant.
Delta odorized its gas through four stations where the odorant entered the gas flow. Delta purchased the odorant in 55 gallon drums from NGO, and each month Delta employees filled the 12 gallon tanks of the odorization equipment. On May 25, 1977, four days prior to the explosion, the odorization tanks were filled. Two days after the accident, they were checked again and found to contain odorant and to be operating properly.[12] According to Delta employees, the "sight" glasses on the odorization machines were checked several times monthly, and there had never been an occasion where an odorant tank had been allowed to run dry.
*269 Gaylon Simmons, Delta's president at the time of the accident, testified the company was putting almost twice the recommended dose, because it was aware that condensation in the gas line could reduce the odorant's effect. Significantly, however, according to Simmons, neither Delta nor others in the gas industry knew that distillates could completely obliterate or "scrub out" the odorant in 1977. Relying on NGO's expertise about odorants, he felt he "had nothing to worry about", or else he would have "looked for" another type of odorant. Although Delta had dehydration plants and systems to extract free liquid condensates from the gas stream, it did not take physical samples of the gas to check on the odorant content in 1977.
John A. Kennedy, an expert on odorants as they relate to the causes and origins of gas explosions, was of the opinion that the odorant added by Delta at the time of the accident was defective and that another compound, dimethyl sulfide, should have been added to the product to give the odorant more strength and stability in areas where there was some absorption or "scrubbing out". According to Kennedy, it was Delta's responsibility, "in conjunction with" NGO's expertise, to eliminate the contaminants that account for "fading". Kennedy was of the further opinion that a warning should have been placed on the drums stating that condensates or gas distillates could obliterate the odorant. This testimony was significant in light of the acknowledgement that NGO had no warning label on the odorant drums to warn gas company personnel that condensates could "scrub out" the odor.
NGO's president, Seth T. Roberson, testified the odorant shipped to Delta came from a 10,000 gallon batch manufactured by NGO that had been tested and found to conform to standards. According to Roberson, this product is a stable compound having the highest odor per pound of NGO's odorants, and does not break down under normal conditions, although its odor can be absorbed by condensates in the gas line. This witness testified there was no necessity for NGO to print a warning on the drums because, Delta, like other gas companies, is a sophisticated buyer and should have known the effect of condensates on the odorant. Roberson testified NGO has no control over the product once it is shipped, and the gas company must make certain its odorizing equipment is properly running.
O. John Jacobus, a chemist and statistical analyst, was of the opinion that the lack of odor was not caused by a defective odorant but by Delta's failure to add the odorant uniformly into its gas lines. Nonetheless, although he felt there were "severe questions as to whether Delta's gas was properly odorized", Jacobus could not form an opinion "positively or totally negative".
Finally, the jury had the benefit of testimony of J. Roger Craddock, an expert in gas company operations and odorization practices, who stated it was "common knowledge" in the gas industry that distillates can affect odorant levels and that gas companies must monitor the gas continuously to determine the odorant level. He further testified that the recommended amount of odorant for a gas system depends on the amount of gas flow; and that the gas company has the responsibility to remove condensates.
The evidence considered, we cannot say the jury erred in finding concurrent negligence by NGO and Delta. Although there is ample evidence to support the jury's conclusion that Delta was negligent in failing to odorize the gas as required by statute, to remove the condensates from its lines, or to monitor the odorant level properly through gas sampling, it does not necessarily follow, as argued by NGO, that Delta's fault was the sole cause of the explosion.
The evidence clearly established that the product became ineffective on contact with the condensates in Delta's gas lines. The testimony of Delta's employees that a more than sufficient amount of odorant was added to the line before, during, and after the explosion, supports a conclusion that, despite Delta's normal use of the chemical, NGO's product failed to produce the required odor in Delta's lines.
*270 Notwithstanding NGO's position that gas companies are sophisticated purchasers aware of the effect of condensates on odorants, the jury may have believed the testimony of Delta employees that they were unaware that distillates in gas lines could totally obliterate the effectiveness of the odorant in 1977. The testimony of Delta personnel was that they were aware that the odor could be reduced by condensates in the line but not completely obliterated. Based on this credibility determination, the jury could have reasonably concluded NGO's failure to warn Delta of this phenomenon was a cause of plaintiffs' injuries.
A manufacturer must give warning of any danger inherent in his product's normal use that is not within the knowledge of an ordinary user. Hebert v. Brazzel, 403 So.2d 1242 (La.1981); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). The manufacturer has a duty to know all of the dangerous qualities of the product, and is responsible for making those dangers known to purchasers, even though the product itself is not inherently dangerous. Penn v. Inferno Manufacturing Corporation, 199 So.2d 210 (La.App. 1st Cir.1967), writ refused 251 La. 27, 202 So.2d 649 (1967).
In our case, NGO's duty to warn that distillates can render the odorant completely ineffective is particularly important because NGO holds itself out as "odorant specialists to the gas industry", and its product, though not dangerous alone, is used in connection with a dangerous instrumentality, explosive gas. As an odorant specialist, NGO knew of the effect of distillates or condensates on its product, and had a duty to warn its customers, despite their sophistication, that high distillate content gases require more malodorant.
NGO's breach of its duty to warn Delta adequately in this case was a cause in fact of plaintiffs' injuries, which were within the ambit of the risk sought to be avoided by observance of the duty. Although the natural gas industry may be technologically advanced, the unsophisticated consumers who ultimately use the product in their homes rely on the combined expertise and cooperation of both the odorant manufacturer and the gas company for adequate warning of leaking explosive gas. An odorant manufacturer must be held to a high standard of care in warning gas companies of the limitations of its vitally important product affecting public safety.
Accordingly, considering the evidence, we find no manifest error in the jury's findings.

PRESCRIPTION
Because suit was not filed against NGO within the prescriptive period,[13] plaintiffs could avoid a dismissal against NGO only if NGO and Delta were joint tortfeasors and, as such, solidarily liable. At the conclusion of plaintiffs case in chief, NGO unsuccessfully raised an exception of prescription based on plaintiffs' failure to establish a solidary obligation. According to NGO, the only evidence of Delta's negligence was adduced by NGO in support of the third party demand after plaintiffs had rested. We disagree.
Before resting, plaintiffs established that Delta had a statutory duty to odorize the gas[14] and that the gas flowing into the *271 Hingle residence was odorless. Further, Plaintiffs' expert, Kennedy, testified that NGO's odorant was defective and recognized that Delta had a responsibility "in conjunction" with NGO to remove distillates from the gas line that can account for "fading" of the odorant. Furthermore, Delta's foreman, called by plaintiffs, testified Delta had not taken physical gas samples bi-monthly to check the odorant level as required by Delta's own maintenance manual.
This evidence considered, we conclude plaintiffs established a prima facie case of Delta's negligence making it solidarily liable with NGO. The jury had ample evidence to conclude that Delta was negligent in distributing odorless gas to the Hingle resident in violation of its statutory duty to odorize the gas, and that the risk and harm encountered by the plaintiffs in the gas explosion fell within the scope of protection of the odorization statute. There was also sufficient evidence to find Delta had negligently failed to monitor the system properly to make sure the gas was odorized.
Because plaintiffs successfully carried their burden of proof to establish solidary liability between the defendants, timely service upon Delta within the one-year prescriptive period interrupted prescription as to NGO. The trial judge correctly denied NGO's pleas of prescription. See LSA-C.C. Art. 2097; Clements v. State Dept. of Health, Social and Rehabilitation Service, 391 So.2d 66 (La.App. 4th Cir.1980), writ denied 396 So.2d 932 (La.1981); Palmisano v. United States Fidelity & Guaranty, 371 So.2d 386 (La.App. 4th Cir.1979), writ granted 374 So.2d 663 (La.1979), dismissed per settlement 376 So.2d 155 (La.1979); Wick v. Sellers, 309 So.2d 909 (La.App. 3rd Cir.1975), application denied 313 So.2d 828 (La.1975).
Accordingly, we find no error in the verdict casting NGO and Delta in judgment.

QUANTUM

Rose Fisher
This twenty-two year old plaintiff suffered burns on 10-15% of her body, including first and second degree burns on her face and chest, and second degree burns on both arms.
Mrs. Fisher was hospitalized at Charity Hospital in New Orleans for one week after the accident, where she received intravenous medication and underwent daily whirlpool treatments to debride her burns with the application of silvadene cream twice daily. After her discharge, she was seen as an outpatient twice, and underwent another whirlpool treatment, silvadene application and instruction in home exercise treatments. A Charity Hospital bill in the sum of $342.02 remained unpaid.
Plaintiff testified that when released from the hospital she was unable to move her hands. Plaintiff exhibited scars on her back and arms to the jury.
Considering the extent of Mrs. Fisher's burns, painful treatment, hospitalization, and scarring, we cannot conclude the jury abused its discretion in awarding her $25,000.00 in general damages.

Glenn Fisher
Twenty-eight year old Fisher sustained second degree burns on approximately 12% of his body, including his arms, chest and left foot.
Like his wife, he was hospitalized for one week after the explosion and received intravenous fluids, whirlpool treatments and silvadene applications. On discharge, he used a cane because walking on his left foot was painful. He received outpatient treatment on two occasions.
At the time of the accident, Fisher was earning $3.90 per hour as a welder but was unable to work for six weeks because of his injuries. An unpaid Charity Hospital bill in the sum of $361.50 was introduced into evidence.
*272 Considering the injuries and loss of income, we find no abuse of the jury's discretion in awarding $25,000.00 in general damages to this plaintiff.

Patricia O'Brien
This twenty-five year old plaintiff sustained second degree burns on her forehead, both sides of her face, chin, ear, right arm, left forearm, palm, right knee and ankle, left leg, and third degree burns on her right hand.
Mrs. O'Brien was hospitalized at Charity Hospital for one week after the explosion, and then transferred to St. Bernard General Hospital for two more weeks until June 17, 1977, before being followed as an outpatient.
While hospitalized, plaintiff received a daily regimen of whirlpool treatments, scrubbing of her burns with a wire brush, and dressings with silvadene cream. She also received antibiotics and pain medication. Her medical records indicate she experienced difficulty manipulating the third finger of her right hand and became distressed over the loss of her belongings in the explosion and reports of her daughter Brenda's hallucinations.
On discharge from the hospital, dressings were required over third degree burns on plaintiff's right hand and unhealed second degree burns on her left forearm. Although the record does not specifically mention scarring, it can be presumed from the severity of this plaintiff's burns.
Considering the period of her hospitalization and her pain and suffering, we cannot say the jury abused its discretion in awarding this plaintiff $50,000.00 in general damages.

Lawrence Latour
Damage to this plaintiff was established only through his testimony, in which he described his injuries, "Burns over various parts of my body; my face, arms, my chest and legs."
The force of the explosion had blown Latour outside the home where he remained in "a daze" immediately afterward. After emergency treatment, including a shot for pain, Latour was transported to Charity Hospital where his burns were "scrubbed" with a wire brush and dressed. He was not hospitalized but received "outpatient treatment".
Plaintiff's medical records were not introduced at trial, and the major portion of his testimony concerned not his own injuries, but his efforts in assisting medical personnel and his wife, Patricia O'Brien, in giving physical therapy to the severely injured O'Brien children during their prolonged treatment.
Considering the facts and circumstances, we conclude the $50,000.00 general damage award to this plaintiff constitutes a clear abuse of the jury's discretion. See Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976). Although Latour was obviously burned, it is apparent from his sketchy testimony that his injuries were not so severe as to require extensive treatment. There is no evidence as to loss of income or residual scarring. Perhaps the jury's award may have been motivated by sympathy for Latour's admirable personal sacrifice in treating the O'Brien children. In view of the actual injuries suffered, however, we are compelled to reduce the award to the sum of $15,000.00, which we deem to be "the highest point" reasonably within the jury's broad discretion.

Brenda O'Brien
Brenda, seven years of age when injured, sustained second degree burns over 40% of her body on her chest, back, face, and both legs, making her "unrecognizable" to her mother. Mrs. O'Brien testified that immediately after the explosion her children's skin "was just hanging from them... like raw meat..."
Brenda was hospitalized at Charity for nearly two months from the date of the accident on May 29 until July 27, 1977. She received intravenous fluids and medication, blood transfusions, a high calorie diet, hydrotherapy treatment twice-daily to debride her burns, and applications of silvadene cream. Her early treatment at Charity was *273 complicated by a week-long episode of psychosis and hallucinations, and she became critically ill from an infection in the blood stream. Brenda suffered further from vomiting, lethargy, and blood loss. Despite her major complications, however, her condition stabilized after the first month.
Although Brenda's skin healed without skin grafts, her deep second degree burns produced severely disfiguring "hypertrophic", raised scar tissue on both sides of her face, on her chest, and on both arms, hands and legs. Because hypertrophic scar tissue contracts as it matures, Brenda developed "contracture" deformities and experienced problems bending her left elbow and straightening her knee.
On February 9, 1978, at the Shriner's Burn Institute in Galveston, Texas, Brenda was provided with orthopedic shoes, elasticized clothing and a facial mask to be worn 24 hours a day to flatten her scars.
While hospitalized in Galveston from February 23 until March 8, 1978, Brenda received physical therapy to stretch her limbs and correct her contractural problems. She was discharged with splints on her legs and hands and followed thereafter in April, July and November, 1978. Brenda's therapy continued at home in the interim under the direction of her mother and Mr. Latour who had received instruction in Galveston. The children's special clothing was not comfortable, and Mrs. O'Brien testified that Brenda and her brother "hollered" when their elastic suits were put on and taken off them several times a day between baths.
By February, 1979, Brenda's scars had matured and the pressurized clothing and special shoes were discontinued. In May, 1979, she underwent surgery to remove the scar tissue across her elbow that had prevented full extension of her arm and to release bands of tight scar tissue between her fingers on both hands. She was seen at the Galveston Clinic again in October, 1979, August, 1980, and February, 1981.
At trial, five years post-accident, Brenda's treating plastic surgeon, Dr. Donald H. Parks, testified that Brenda's scars have "matured" but she will require "careful follow-up". Most of Brenda's facial skin has undergone extensive and permanent granular changes of texture and darkening, particularly her forehead, and she has scars on both sides of her face, with a marked one extending along the right side of her jaw. There is also marked hypertrophic scarring between her breasts, and on her right shoulder, back, and both arms and legs. Dr. Parks recommended future surgery on her left wrist, both elbows and ankles, and her left knee to relieve contractions of the scars over those joints. He did not specify a time after which no further treatment would be necessary.
Dr. Parks further testified that Brenda has no "functional" limitations as far as "ability to perform motor skills" or to "function in life." The limitations on her activities are "minimal" and he has encouraged her to participate in all activities. Nevertheless, he stressed that scar tissue is not "normal" skin since it lacks hair follicles, oil and sweat glands. Because Brenda's skin would crack in dry humidity and is prone to injury in sunlight, it will become necessary to restrict her activities. According to Dr. Parks, Brenda's scars are permanent. He foresaw little improvement in her appearance.
In addition to physical pain, Brenda has suffered psychologically from her physical disfigurement. Dr. Carmen Ramos, Brenda's treating psychiatrist, testified Brenda has contended with name-calling, such as "scar face" by her classmates, and will have more problems during the dating period. She has reacted to her problems by becoming depressed through negative feelings about herself and by "regressing" through fantasizing about being popular. Concerning serious "coping" problems Brenda might encounter, Dr. Ramos saw "evidence of psychotic thought process" in the sense of being "out of touch with reality." This physician testified, however, that Brenda has improved in therapy since 1980 and is "coping" better with her problems and doing well in school. She testified that Brenda has had more problems than her brother *274 in facing surgery in the past, but now has a "sober" attitude about future surgery. It is "possible" that Brenda will cope with her situation through "adequate" care, but Dr. Ramos could not "predict it".
Mrs. O'Brien testified that Brenda and her brother lost a year of school because of the accident and that Brenda has suffered from teasing and "locks herself in her room" to avoid associating with people or being seen.
Although Brenda's scarring affects her cosmetically and not functionally, it does not lessen the extent of physical and psychological pain she has suffered and will suffer from her prolonged, painful medical treatment and permanent disfigurement. Despite Brenda's attendance in public school and the potential for leading a useful life, a reasonable conclusion can be made that her appearance subjects her to socialization problems.
We are mindful that there is an absence of evidence of anticipated loss of future earnings resulting from functional disability; nonetheless, a reasonable conclusion might be reached that cosmetic deformity might have an adverse effect on one's ability to gain employment. Considering the seriousness of the burns and the scarring, and cognizant that the jury observed the scars in chambers, we cannot say that the $1,500,000.00 general damage award (reduced by the trial judge to the extent of 1/3) is an abuse of the jury's discretion.[15]

Timothy O'Brien
Timothy, four years old when injured, suffered second and third degree burns over 35% of his body, on his face, arms, hands, abdomen, legs and feet.
He was hospitalized at Charity Hospital for three months (from May 29 to August 29, 1977), and underwent painful treatments similar to his sister's, including whirlpool baths to debride his burns, intravenous medication, transfusions, and a high calorie diet. Timmy received intravenous fluid because of massive loss of blood plasma from his burns. Skin grafts were required on the back of both hands, and on his thigh, lower leg, and foot.
Like Brenda, Timmy began treatment at the Shriner's Burn Institute in Galveston on February 9, 1978, under Dr. Parks' care. Timmy had hypertrophic scar tissue in the burned areas, including contracting scar tissue across his right elbow, "webbing" scar tissue on both hands, and a contracture on his right foot causing his toes to curl upward. He was fitted with splints, elasticized wraps and tightly fitting orthopedic shoes to put pressure on his scar tissue and toes.
Timmy was readmitted to the hospital in Galveston on February 23, 1978, when he began vigorous therapy and exercise to straighten his contractures. This procedure involved hanging weights from his right arm to stretch the scar tissue. Timmy was fitted with an elasticized garment and mask to be worn 24 hours a day.
After discharge from the hospital on March 8, 1979, Timmy continued painful therapy at home under the direction of his mother and wore the elasticized suit continuously except when bathing. He returned for follow-up examinations in Galveston in April and July, 1978, and February, 1979, when the orthopedic shoes and elasticized suit were discontinued.
From May 22 until June 14, 1979, Timmy was again hospitalized in Galveston for hand surgery to correct the webbing deformity and foot surgery to reposition his toes. The foot operation involved the use of a skeletal suspension device put in place for ten days with metal pins to reposition his toes through force. He was fitted with orthopedic shoes to be worn 24 hours a day, and thereafter has been followed as an outpatient.
At the time of trial, five years post-accident, Timmy bore permanent hypertrophic scars. His face has a granular irregularity in the upper lip and right cheek and a *275 mottled discoloration on the right side. He has a "rather heavy disfiguration" and loss of hair in the front of the right ear. There is a hypertrophic scar at the angle of his jaw on the right side of the neck. Timmy has "extremely extensive" and "permanent" scarring on the right upper arm extending down to his fingertips, a slight recurrence of webbing between the thumb and index finger on his right hand, and a tight band of scar tissue across the right wrist extending to the thumb. Despite prior surgery to his right foot, Timmy's little toe remains deformed. His left hand will remain scarred, and Timmy will have a "major permanent deformity" of the left hand.
Because Timmy has considerable growth potential, it may be necessary to carry out future surgical releases over the top of his right foot as new contractures develop. Further operations could be performed to reconstruct sideburns in front of his right ear and to remove some of the scar from the right side of his jaw. Timmy will also require further operations to remove the webbing between his right thumb and index finger and to relieve the tightness along his right elbow. The abnormal texture of his skin cannot be altered surgically.
Although Timmy, like his sister, has minimal "functional" limitations in performing motor skills and has been urged to participate in activities, he will be required to limit his exposure to sunlight and dry humidity because of scarring. Dr. Parks described Timmy and Brenda as "children that have made the best of their situation...."
Dr. Carmen Ramos, the psychiatrist, felt that Timmy was experiencing problems, including name calling such as "burn face" by his classmates, a "psychological conflict" resulting in avoidance of painful feeling about himself, and difficulties with his attention span. His school work has deteriorated, and he has acted immaturely at home. Mrs. O'Brien testified Timmy is "letting it get him real bad" and "stays to himself". Dr. Ramos suggested Timmy become involved in therapy, though she did not think it would be "long term". Like Brenda, with "adequate care" Timmy might be able to cope in "an improving way". Although she could not predict it, this physician hoped that after therapy Timmy would have enough inward strength to cope with his problem.
As in Brenda's case, we are mindful that there exists an absence of evidence of anticipated loss of future earnings resulting from functional disability. Nonetheless, in the jury's mind, a reasonable conclusion could have been reached that cosmetic deformity might have an adverse effect on Timmy's ability to gain employment. Timmy has suffered severe physical and psychological damage resulting in disfigurement that will hamper his socialization.
Considering the serious burns, scarring, and deformities (observed by the jury in the judge's chambers), we cannot say the $1,500,000.00 general damage award (reduced by the trial judge to the extent of 1/3) constitutes an abuse of discretion.

DECREE
Accordingly, we amend the judgment as follows:
The judgment in favor of the plaintiff, Lawrence Latour, and against NGO Chemical Division of Helmerich & Payne, Inc. and Mrs. Louise Hingle in the sum of THIRTY THREE THOUSAND, THREE HUNDRED THIRTY THREE AND 33/100 ($33,333.33) DOLLARS is reduced to the sum of TEN THOUSAND AND NO/100 ($10,000.00) DOLLARS, together with legal interest from date of judicial demand until paid and for all costs.
In all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.
NOTES
[1] Plaintiffs received the following amounts in settlement:

Brenda O'Brien - $1,000,000.00
Timothy O'Brien - 1,000,000.00
Patricia O'Brien - 12,500.00
Lawrence Latour - 12,500.00
Glenn Fisher - 12,500.00
Rose Fisher - 12,500.00

Lawrence Latour, Patricia O'Brien and her two children also agreed to divide with Delta and its insurers "any recovery made: from the action against Helmerich & Payne between $800,000.00 and $1,600,000.00 ... on funds received from Helmerich & Payne after any division because of joint tortfeasor releases." Glenn and Rose Fisher, however, made no such agreement.
At trial, the following stipulation was read to the jury:
"Before trial, plaintiffs made settlement with Delta Gas, Inc. and its insurers and signed Releases releasing them from further claims in this lawsuit.... As part of this settlement agreement, it was also agreed that Delta Gas, Inc. and its insurers would have an interest in the plaintiffs' remaining claims against Helmerich & Payne, Inc. so that if plaintiffs receive a judgment against Helmerich & Payne, Inc. following this trial, Delta Gas, Inc. and its insurers could receive a part of that judgment and get back part of what they had paid to the plaintiffs."
[2] Judgment was rendered in favor of each plaintiff as follows:

Brenda O'Brien$1,000,000.00; Timothy O'Brien$1,000,000.00; Patricia O'Brien $33,333.33; Lawrence Latour$33,333.33; Glenn Fisher$16,666.67; Rose Fisher$16,666.67.
[3] Rule 2-12.4 of the Uniform Rules, Courts of Appeal provides in pertinent part:

"All specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed."
[4] In the trial court, NGO unsuccessfully moved for a mistrial based on unfair allotment of peremptory challenges. NGO's applications for supervisory writs from the denial of its motion were denied by this court and the Supreme Court.
[5] LSA-C.C.P. Art. 1764 provides: "Each side is allowed six peremptory challenges. If there is more than one party on any side, the court may allow each side additional peremptory challenges, not to exceed four. Each side shall be allowed an equal number of peremptory challenges. If the parties on a side are unable to agree upon the allocation of peremptory challenges among themselves, the allocation shall be determined by the court before the examination of the voir dire."
[6] At the conclusion of the charge conference, NGO objected as follows:

"NGO at this time objects to the failure of the Court to utilize the proposed special charges and we would provide for the record the numbers but due to the fact of a change in alignment it wishes the record to reflect these charges and will provide them to the court. One other point, I wish to place in the record at this time my objection, reurge my objection giving the Jury Interrogatories and Jury Charges based on their opinion of the evidence presented in the case."
[7] LSA-C.C.P. Art. 1793 provides, in pertinent part:

"A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."
[8] The objectionable charge reads:

"The first thing that you should know about the law is that the Plaintiffs and the Third-Party Plaintiff, Helmerich & Payne [NGO], in this action must each prove their cases by a preponderance of the evidence. This means that the Plaintiffs must convince you that, when the evidence is taken as a whole, the facts or causes sought to be proved are more probable than not. If they fail to prove or establish any essential element of their case by a preponderance of the evidence, then you must find that they have failed to prove their case sufficiently to recover.
This means that the Third-Party Plaintiff, Helmerich & Payne, must convince you that, when the evidence is taken as a whole, the facts or causes sought to be proved are more probable than not. If they fail to prove or establish any essential element of their case by a preponderance of the evidence, then you must find that they have failed to prove their case sufficiently to recover." The trial judge then gave a similar instruction concerning Third-Party Defendant Delta Gas' burden of proof.
[9] The judge instructed the jury as follows:

"R.S. 33:4522: `Malodorants required. Every person engaged in the business of handling, storing, selling, or distributing natural or other odorless gases, except liquified petroleum gases, shall malodorize the gas or gases by the use of malodorant in accordance with pipeline safety rules and regulations promulgated by the assistant secretary of the office of conservation of the Department of Natural Resources.'
"The ordinarily prudent person will normally obey the statutes which apply to his conduct, but in exceptional circumstances, even a violation of the statute may be reasonable. You must consider, in the light of all the circumstances, whether an ordinarily prudent person in Defendant's position would be reasonable in violating the statute. If so, then the violation is not sub-standard conduct. But if not, the violation is unreasonable, and therefore below the standard of care to which we hold the Defendant in this case."
[10] The judge specifically stated:

"In this case involving alleged damage from a product, the basic standard applicable to the manufacturer is: The manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition or manufacture of the product, if the injury might reasonably have been anticipated. I will now explain to you the meaning of this standard, along with the other elements of Plaintiff's case. In order to be successful, the Plaintiff must establish all the essential elements of his case."
[11] Concerning Delta's alleged misuse, the judge instructed as follows:

"A manufacturer is not liable for the harm suffered by a Plaintiff if it is caused in part by misuse of the product by another. Misuse means mishandling the product, or using it in a way which the manufacturer could not have reasonably foreseen or expected in the normal and intended use of the product. This is an issue on which the Defendant, Helmerich & Payne, Inc. [NGO], has the burden of proof. Thus, if you are convinced by Defendant's evidence that the product has been mishandled by Delta, or substantially changed before it was used, or put to an abnormal use, or combined with another product which made it dangerous, and this contributed to plaintiff's harm, then you must return a verdict in favor of Helmerich & Payne (NGO) and against Delta Gas, Inc."
[12] Only two gallons of odorant were added to one of the odorization stations checked after the accident.
[13] The explosion occurred on May 29, 1977. Plaintiffs initially filed suit in U.S. District Court on May 24, 1978, naming Delta, Mrs. Hingle and others as defendants. Only Delta was served within one year of the date of the accident. NGO was named as a defendant in the federal court suit on January 3, 1979, by supplemental and amended complaint. Plaintiffs' suit was dismissed in the U.S. District Court on March 27, 1980, for lack of diversity jurisdiction. The present suit was filed against the named defendants on January 3, 1979, in the Civil District Court.
[14] LSA-R.S. 33:4522 provides:

"Every person engaged in the business of handling, storing, selling, or distributing natural and other odorless gases, except liquified petroleum gases, for domestic use, or supplying such gases by pipe-lines or otherwise to any public building where people reside or congregate, shall malodorize the gas or gases by the use of a malodorant agent of such character as to indicate by a distinctive odor the presence of the gas. The malodorant agent shall be non toxic and non corrosive and not harmful to leather diaphragms in gas equipment." (In 1981, this statute was amended but with no effect on the instant case).
[15] We point out that the jury was made aware in the judge's charge of the stipulation by counsel of the pre-trial settlement with Delta. The jury very well could have taken the agreement into consideration and recognized that Delta would share (to some extent) in the award.