CARAWAY, J.
11 This case involves an allegedly defective lamp sold by Fred’s Stores of Tennessee, Inc. (“Fred’s”), which purportedly caused a fire in a house insured by the plaintiff, Allstate Insurance Company (“Allstate”). In this court’s prior opinion concerning the trial court’s dismissal of the case on the exception of prescription, we ruled that the doctrine of contra non va-lentón applied because Allstate was prevented from determining the product’s manufacturer whose identity was not revealed on the product. Allstate Insurance *978 Co. v. Fred’s, Inc., 44,508 (La.App.2d Cir.8/19/09), 18 So.3d 172. The insurer of the alleged manufacturer, Colony Insurance Company (“Colony”), sought a writ of certiorari from the Louisiana Supreme Court. Upon supervisory review of the ruling, the court reversed this court’s decision, as follows:
Writ granted. We reverse the court of appeal decision finding the doctrine of contra non valentem applicable to the facts presented. The court of appeal erred in finding Allstate’s delay “cannot be attributable to its own neglect,” an essential element in a defense to prescription based on this doctrine. Allstate’s two-year delay between its discovery request and its motion to compel, plus an additional year before adding Colony to the suit, evidences a lack of due diligence on the part of Allstate, precluding application of the contra non valentem doctrine. Accordingly, we reverse the decision of the court of appeal and remand to the court of appeal for consideration of pretermitted issues not addressed in the original opinion.
Allstate Insurance Co. v. Fred’s, Inc., 09-2275 (La.1/29/10), 25 So.3d 821.
The pretermitted issue noted in our first opinion which might also serve to defeat the claim of prescription concerns the liability of Fred’s to the homeowner/claimant for the defective lamp under the Louisiana Products Liability Act, La. R.S. 9:2800.51, et seq. (hereinafter the “LPLA”). |2Fred’s was timely sued initially by Allstate, and the action against Fred’s would interrupt prescription if Fred’s is liable as a non-manufacturer seller addressed in La. R.S. 9:2800.53(l)(a) [hereinafter “Section 2800.53(l)(a)”].
The evidence in the trial court was that the allegedly defective lamp which caused the house fire was labeled by Fred’s. The question now presented under Section 2800.53(l)(a) is whether the designation of Fred’s on the product’s label may result in the non-manufacturer seller’s liability under the LPLA which is imposed upon one “who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.”

Facts

The evidence at the trial of the exception of prescription was introduced through the affidavit of an electrical engineer and fire investigator, Vernon Wade. Wade stated that he was retained by Allstate to investigate the subject fire. While investigating the fire scene, he found a red ceramic lamp which had been purchased at Fred’s shortly before the fire. He identified the cause of the fire as resulting from an electrical short in the power cord of the lamp. With the assistance of the homeowner and her daughter, Wade “secured a lamp from Fred’s Discount Store” and “was informed that the new lamp was an exact duplicate of the damaged lamp found in the area of origin of the fire.” The exemplar lamp was labeled, “Made in China. Distributed by Fred’s.” Wade noted that “there was no other company or brand displayed on the lamp or its tags.”

^Louisiana Products Liability Law

The history of Louisiana’s product liability law prior to the 1988 enactment of the LPLA reveals that the ruling in Penn v. Inferno Mfg. Corp., 199 So.2d 210 (La.App. 1st Cir.1967), writ denied, 251 La. 27, 202 So.2d 649 (1967), was the leading case before the LPLA which explained the rationale for the imposition of liability upon the non-manufacturer seller which labels the product as its own. As we noted in our initial opinion, Penn is a remarkably similar case which involved the manufacturer and seller of a defective sight glass for a testing device which exploded and injured an individual in an oil field accident. Also, in the context of a plea of *979 prescription, the court found a gauge distributor (Inferno) solidarily liable with the glass manufacturer (Corning) for a defect in the sight glass. The gauge distributor had labeled the gauge as its own. The plaintiff first sued the gauge distributor believing it to be the manufacturer of the defective glass. The gauge distributor answered the suit alleging that it did not manufacture the glass and named the manufacturer after the applicable prescriptive period had run. Plaintiff amended its petition some three years after the accident, to add as defendants the glass manufacturer, which was never served, and its insurer. After trial, the insurer raised the exception of prescription urging that the gauge distributor, Inferno, was not responsible under our redhibition law or products liability theory for the defective glass.
The Penn court affirmed the trial court’s rejection of the prescription exception finding that Inferno’s labeling of the product made it solidarily liable with the manufacturer. Therefore, the timely suit against Inferno ^served to interrupt prescription. The primary rationale for the determination of Inferno’s liability as a non-manufacturer seller was based upon rulings in other states and the Restatement of the Law of Torts cited in the opinion. Section 400 of the Restatement provides as follows:
400. Selling As Own Product Chattel Made By Another
One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.
Rest.2d Torts § 400 (1965).
This “as his own” product test, or so-called “holding out” theory, for the imposition of a duty in tort upon the non-manufacturer seller is discussed in comment (d) of Section 400 of the Restatement, as follows:
d. The rule stated in this Section applies only where the actor puts out the chattel as his own product. The actor puts out a chattel as his own product in two types of cases. The first is where the actor appears to be the manufacturer of the chattel. The second is where the chattel appears to have been made particularly for the actor. In the first type of case the actor frequently causes the chattel to be used in reliance upon his care in making it; in the second, he frequently causes the chattel to be used in reliance upon a belief that he has required it to be made properly for him and that the actor’s reputation is an assurance to the user of the quality of the product. On the other hand, where it is clear that the actor’s only connection with the chattel is that of a distributor of it (for example, as a wholesale or retail seller), he does not put it out as his own product and the rule stated in this section is inapplicable. Thus, one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark. When such identification is referred to on the label as an indication of the quality or wholesomeness of the chattel, there is an added emphasis that the user can rely upon the reputation of the person so identified. The mere fact that the goods are marked with such additional words as “made for” the seller, or describe him as a distributor, particularly in the absence of a clear and distinctive designation of the real manufacturer or packer, is not sufficient to make inapplicable the rule stated in this Section. The casual reader of a label is likely to rely upon |fithe featured name, trade name, or trademark, and overlook the qualification of the description of source. So too, the fact that the seller is known to carry on only a retail business *980 does not prevent him from putting out as his own product a chattel which is marked in such a way as to indicate clearly it is put out as his product. However, where the real manufacturer or packer is clearly and accurately identified on the label or other markings on the goods, and it is also clearly stated that another who is also named has nothing to do with the goods except to distribute or sell them, the latter does not put out such goods as his own. That the goods are not the product of him who puts them out may also be indicated clearly in other ways.
Penn’s reliance upon the products liability/tort theory of the Restatement amounted to a rejection of the defense argument that the retail seller could only be held accountable for the defects of a product under Louisiana’s redhibition law for sales. See, La. C.C. art. 2545. In redhibition in order for the seller to be liable for damage caused by a defective product, he would have to know of the defect before the sale whether or not he labeled the product as his own. Thus, Penn’s holding represents an import of the common law tort theory for products liability into Louisiana’s notion of delictual “fault” under Civil Code Article 2315, despite the contrary implication of the redhibition principle.
In 1978, the Louisiana Supreme Court had occasion to consider a non-manufacturer seller’s liability for its labeling of a product in Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). The defective hammer involved in the accident was sold with the Sears name and the “Craftsman” trademark, yet was manufactured by another company. Expressing multiple legal principles regarding why the responsibility of Sears was “the same as that of the manufacturer,” the court first cited Penn and recognized its ruling |fias the basis for Sears’ fault since “it held the product out to the public as its own.” Id. at 930.
The next important development leading to the enactment of the LPLA, and specifically, Section 2800.53(l)(a), was the 1983 proposed legislation from the Louisiana State Law Institute presented in House Bill 711 of 1983. William E. Crawford, Tort Law § 16:31, at 429, in 12 Louisiana Civil Law Treatise (2d ed.1983). In this first attempt to provide specific statutory law for products liability in Louisiana, the actual language now employed in Section 2800.53(l)(a) was drafted and included in the proposed definition for “manufacturer,” as section 2800.2(A)(1) of the bill. Id. Additionally, the Law Institute’s proposed comment (b) for that section of the bill provided, as follows:
(b) Paragraph (A)(l) of this Section reflects the existing jurisprudence that has extended manufacturer status to the product seller who labels a product as his own. See Penn v. Inferno Mfg. Corp., 199 So.2d 210 (La.Ct.App. 1st Cir. 1967); Clark v. Sears, Roebuck & Co., 254 So.2d 62 (La.Ct.App.3d Cir.1971); Fairburn v. Montgomery Ward & Co., Inc., 349 So.2d 1280 (La.Ct.App. 1st Cir. 1977); Renard v. Bradley Automotive, 365 So.2d 1382 (La.Ct.App.2d Cir.1978); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978).
Id. at 434-435. While the 1983 legislative proposal was not adopted, Professor Crawford correctly observes in his treatise that many of the eventual provisions of the LPLA are derived substantially from the 1983 Law Institute bill.
With the passage of the LPLA in 1988, a multifaceted definition for the term “manufacturer” was employed in the legislation which holds the actual manufacturer and other non-manufacturing parties culpable as a | ^‘manufacturer” for damages caused *981 by a product. This definition is set forth in Section 2800.53(1), as follows:
(1) “Manufacturer” means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. “Manufacturing a product” means producing, making, fabricating, constructing, designing, re-manufacturing, reconditioning or refurbishing a product. “Manufacturer” also means:
(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
(d) A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer. The court shall take into consideration the following in determining whether the seller is the alien manufacturer’s alter ego: whether the seller is affiliated with the alien manufacturer by way of common ownership or control; whether the seller assumes or administers product warranty obligations of the alien manufacturer; whether the seller prepares or modifies the product for distribution; or any other relevant evidence. A “product of an alien manufacturer” is a product that is manufactured outside the United States by a manufacturer who is a citizen of another country or who is organized under the laws of another country.

Discussion

Allstate’s action has charged Fred’s and Colonial’s insured, L & L Import Enterprises, Inc., each as a “manufacturer” in differing capacities as that term is defined under the LPLA. L & L Import is alleged as the actual manufacturer and is also alleged in Allstate’s amending petition to be at fault in designing the lamp. Although Colonial has denied these allegations and claimed that L & L Import was merely a wholesaler of the lamp without 18control over its design and manufacturer, Allstate’s allegations in its petition of the substance of its claim against L & L Import and the defect in the product itself are presumed as true for purposes of the peremptory issue of prescription.[1]
With L & L Import presumed from the allegations to be a “manufacturer” with liability under the LPLA, we first conclude that a timely suit against a separate “manufacturer” under the LPLA would interrupt the prescription applicable to Allstate’s claim. As expressed in La. R.S. 9:2800.52, which defines the scope of the LPLA, the “conduct or circumstances that result in liability under [the LPLA] are ‘fault’ within the meaning of Civil Code Article 2315.” Thus, liability as a “manu *982 facturer” under the LPLA is delictual and both L & L Import and Fred’s may be shown as joint tortfeasors. Interruption of prescription against one joint tortfeasor by a timely action is effective against all joint tortfeasors. La. C.C. art. 2324(C).
Our interpretation of Section 2800.53(l)(a) for the measure of Fred’s labeling of this product is governed by the following Civil Code principles:
Article 9. Clear and unambiguous law
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.
| {Article 10. Language susceptible of different meanings
When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law.
The statutory language in question pertains to one “who labels a product as his own.” Initially, from the general context of a product’s label, we make the following observations. One, the dictionary definition of label is “something functioning as a means of identification, esp. a small piece of paper or cloth attached to an article to designate its origin, owner, contents, use, or destination.” The American Heritage Dictionary, 709 (2nd ed.1982). This reflects that one who “labels” can communicate with that label for many different purposes. Second, under the LPLA, a product “means a corporeal movable that is manufactured for placement into commerce.” La. R.S. 9:2800.53(3). Therefore, regarding the labeling of a product, the label is a communication for a designation of a corporeal movable which is placed into commerce.
With the meaning of the words “label” and “product” clear and unambiguous, we next find it most important to observe that the phrase “labels a product as his own” does not literally identify the subject of manufacturing as the targeted designation of the product as it is labeled and placed in commerce for communication to a purchaser. If Fred’s was the manufacturer and labeled the product, “Manufactured by Fred’s,” liability for the defective lamp would be predicated upon Section 2800.53(1) alone which holds culpable the actual manufacturer, and such communication to the purchaser of the actual manufacturer would be irrelevant. Instead, the first phrase of the statute regarding the product label concerns the labeling | tnof a product “as his own” or for purposes of a designation and emphasis to the purchaser of a party’s identity with the product. From the literal wording of the statute, this labeling “as his own” results in LPLA liability upon a non-manufacturer irrespective of what the label may or may not suggest about the actual manufacturer.
For example, in Chappuis, supra, the labeling of the defective hammer with the Sears name and its Craftsman brand did not designate Sears as the manufacturer. The actual manufacturer, Vaughan and Bushnell, was not listed on the product, and Sears is a well-known national retailer of products, not necessarily understood to be a manufacturer. The Supreme Court’s summary conclusion for the liability for the Sears label likewise did not place emphasis upon the label’s implication that Sears might have manufactured the hammer, but that Sears “held it out to the public as its own.” Chappuis, supra.
In interpreting the application of the language of the initial labeling phrase of Section 2800.53(l)(a), we disagree with the conclusion reached by the federal district court in Shapiro v. Wal-Mart Stores, Inc., *983 1994 WL 577346 (E.D.La.1994), concerning the second phrase of the statute. In a footnote, the court concluded:
The phrase “labels a product as his own” in La. R.S. 9:2800.53(l)(a) is defined by the remainder of that subsection which provides, “or who otherwise holds himself out to be the manufacturer of the product.” The statute therefore refers to a label creating the appearance that the named entity manufactured the product.
\uId. note 2. The court’s strained use of a type of ejusdem generis[2] construction was inappropriate. First, the two phrases are in the disjunctive and the prohibition of La. R.S. 1:9[3] against merging their separate meanings into one is clearly applicable. Second, the phrase, “otherwise holds himself out,” is expressly in contrast to the labeling of the product with the non-manufacturer’s name which is the subject of the initial phrase of the statute. The leading case where a non-labeler/non-manufacturer seller was held liable for a defect in a product is Rutherford v. Coca-Cola Bottling Co. of Shreveport, 501 So.2d 1082 (La.App. 2d Cir.1987). In Rutherford, the consumer brought an action against the local bottler for injuries allegedly suffered after finding a bug in a canned soft drink. The can’s label contained the names of the national company, Coca-Cola, USA, and the cannery of the beverage, but not the name of the local bottling manufacturer which was the distributor of all Coca-Cola products in Shreveport. Nevertheless, the local bottler which only retailed and distributed the can drink was held liable for the can’s defect because it held itself out as the manufacturer of Coca-Cola products in Shreveport. Notably, Chief Judge Hall (later Justice Hall) observed that “insofar as the consumer in its distribution area [was] concerned, there [was] no distinction between bottled and canned Cokes” and “the fact that the label contains a small print | ^identification of the actual manufacturer is of no consequence.” Id. at 1085-1086.
Therefore, from the clear language of the statute, the two descriptive phrases of Section 2800.53(l)(a) address two different situations by which a non-manufacturer seller may be liable. Our interpretation for this dispute concerns one “who labels a product as his own.”
Next, turning to the phrase “as his own,” we find that the implication of ownership from this term is not the only key to its scope and meaning. The phrase “as his own” in the overall context of the manufacture, distribution and sale of a product has a breadth of meaning. Multiple parties along the distribution chain of the product to the purchaser may own the product at the manufacturing, wholesale, and retail stages. At the critical time of the sale, the retail seller is typically the owner of the product, yet that product may be labeled by another non-manufacturing party “as his own.”
For example, the defective canned drink in Rutherford contained the recognized *984 name brand of Coca-Cola on the label. Coca-Cola, USA did not own and distribute the product at the time of the sale to the consumer nor was it responsible for the defective canning manufacturing process which led to the insect inside the can. Yet, while neither an owner, distributor nor manufacturer, Coca-Cola, USA might still be said to have labeled the product as its own. In Chappuis, the retail sales business of Sears would be generally understood by a purchaser as involving Sears’ ownership of all of its products for sale regardless of their labels. In that sense, Sears’ labeling |13of the defective hammer with its name did not convey a message to the purchaser about its ownership of the hammer any different from the other brands of hammers for sale at Sears. The Sears label, as has been noted, also did not clearly indicate that it manufactured the hammer. Nevertheless, our Supreme Court determined that Sears was at fault for conveying to the purchaser something more than just its ownership or its manufacturing of the hammer, and it expressed this basis for fault as Sears’ holding the product out “as its own.”
In summary, from our interpretation of the language of the statute under the directive of Civil Code Article 9, the legislative use of the word label, while not ambiguous, is clearly a general and broad term. The labeling of a product at which Section 2800.53(l)(a) is directed is also not so narrowly restricted by the phrase “as his own” to mean only a label designation suggesting that the labeling party is the actual manufacturer or that it owns the product at the time of sale. This language of the LPLA therefore does not focus on one specifically worded label by which a non-manufacturing labeler of the product becomes liable. The LPLA liability can arise from different labels which are expressed on the product. This does not mean that the phrase one “who labels a products as his own” is ambiguous, but it does allow for the employment of the rule of Article 10 of the Civil Code for the statutory measure of the wording of a given label, such as Fred’s, for a determination of liability.
Fred’s label on the lamp designated that it was “Distributed by Fred’s.” The lamp is also labeled, “Made in China.” Otherwise, the lamp 114had no label which identified another party as having any connection with the lamp. Regarding the designation of China as the place of manufacture, while the statement in its context suggests that Fred’s did not manufacture the lamp, the statement’s failure to identify the manufacturer also leaves open the further suggestion of the possibility of Fred’s involvement with the product in some capacity as it was produced in China.[4] There is also a further implication to the purchaser that the placement of the label on the lamp occurred at the time it was manufactured in China such that Fred’s involvement with the product extended to the time of its manufacture. These inconclusive inferences which the purchaser might draw from the “Made in China” label do not significantly diminish the meaning which can be ascribed independently to the label, “Distributed by Fred’s.” Therefore, that label, “Distributed by Fred’s,” will be our primary focus for the consideration of whether Fred’s labeled the lamp as its own.
From a basic understanding within the context of the sale of a product, the label, *985 “Distributed by Fred’s,” means that Fred’s delivered or dispensed the product in commerce. The purchaser at Fred’s would understand that Fred’s is the retail seller of the product and also the owner of the lamp at the time of sale. In that sense, the label confirms what the purchaser would know about any product for sale at Fred’s with or without a label. Nevertheless, Fred’s did label the product, the critical act which is the subject of Section 2800.53(l)(a), and the label confirms that the product [isis Fred’s “own” product since it is from Fred’s ownership that its distribution power is derived. From this standpoint, Fred’s labeled the product as its own.
When we further consider Fred’s sale of the lamp to a customer in its store, it is not unreasonable that a purchaser might conclude that Fred’s is only the retail seller/distributer of the product and not its manufacturer. With that understanding, similar to the perception of a large retailer like Sears, the label, “Distributed by Fred’s,” is not unlike a label simply designating or branding the lamp as “Fred’s.” The label suggests a direct connection of the product with Fred’s, but the purchaser generally considers Fred’s not the actual manufacturer of its labeled product.
A final matter which aids in the measure of Fred’s label is the fact that the lamp in question has no other party’s label. For example, the labeling of a lamp, “Manufactured by General Electric. Distributed by Fred’s,” might make a difference in the answer to the question of whether Fred’s had labeled such lamp as its own. Without any other party listed in the labeling of this lamp, however, the purchaser can consider this as a Fred’s lamp and not as a totally unbranded lamp.
Our conclusion that Fred’s labeled the allegedly defective lamp “as his own” comes from the clear language of Section 2800.53(l)(a) and from the actual language of Fred’s label. Moreover, this conclusion conforms to the purpose of the law as shown by the jurisprudential development of our products liability law leading to the LPLA. The LPLA holds the obviously culpable party, the manufacturer, at fault. The labeler/non-manufacturer of 116the product might have no connection whatsoever with the design and manufacture of the defective product; yet the legislature also chose to hold such party additionally at fault. With that legislative choice, most non-manufacturing labelers under the statute’s scrutiny are distributors of the product at some point along the distribution chain. The fact that the label acknowledges “distribution” does not diminish the import of the labeler’s expressed connection with the product upon which the liability of Section 2800.53(l)(a) arises.
The purpose of such rule aimed at the product’s labeler was first recognized in the ruling in Penn, supra, which borrowed from the reasoning of the Restatement of Torts. The official comment (d) of the Restatement, which was in the Restatement at the time of the passage of the LPLA, best expresses the purpose for holding the labeler at fault. The purpose of the rule considers the perspective of the purchaser and his reliance placed upon the labeler of the product in many situations where the identity of the product’s manufacturer is unclear in the sale of the product. The label communicates to the purchaser that the product “appears to have been made particularly for the actor [label-er].” Rest.2d Torts § 400 (1965), Official Comment (d). Specifically addressing a product labeled as distributed by a party, the Restatement comment provides that such label is not sufficient to change the view that the product has been “put out” as the labeler’s own product. “The casual reader of a label is likely to rely upon the *986 featured name, trade name, or trademark, and overlook the qualification of the description of the source.” Id. The same operative phrase, “as his own,” of |17the Restatement was chosen for the LPLA, and our view of the Fred’s label as falling within the purview of Section 2800.53(l)(a) is in harmony with this underlying policy.

Conclusion

Since we find that the evidence presented for the exception of prescription establishes the liability for Fred’s for this products liability claim, Allstate’s timely suit against Fred’s interrupted prescription for its additional claim against Colony. Accordingly, the trial court’s grant of the exception of prescription is reversed and the case remanded. Costs of appeal are assessed to appellee.
REVERSED AND REMANDED.
PEATROSS, J., dissents with written reasons.

. Montgomery v. Breaux, 297 So.2d 185 (La.1974); Reed v. Abney, 04-1928 (La.App. 1st Cir.2/10/06), 928 So.2d 585. (“all that must be considered in the peremptory exception of prescription is whether there is sufficient evidence to show that the alleged time period has run.") On the trial of the prescription exception pleaded at or prior to the trial of the case, evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition. La. C.C.P. art. 931. In the absence of evidence, the objection of prescription must be based upon the facts alleged in the petition, and all allegations thereof are accepted as true. Louisiana Employers-Managed Ins. Co. v. Litchfield, 01-0123 (La.App. 1st Cir. 12/28/01), 805 So.2d 386.

. Black states: A canon of construction that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed. For example, in the phrase horses, cattle, sheep, pigs, goats, or any other farm animal, the general language or any other farm animal — despite its seeming breadth — would probably be held to include only four-legged, hoofed mammals typically found on farms, and thus would exclude chickens. Black's Law Dictionary (8th ed.2004).

. La. R.S. 1:9 states: Unless it is otherwise clearly indicated by the context, whenever the term "or" is used in the Revised Statutes, it is used in the disjunctive and does not mean "and/or”.

. As shown by die additional subparts of Section 2800.53(1) which address fault of other non-manufacturers, a seller may "exercise control over” or influence upon the design and quality of the product or act through an affiliated foreign manufacturer for the product's importation. La. R.S. 9:2800.53(1 )(b) and (d).