# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #048

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **24th day of October, 2025** are as follows:

**BY Guidry, J.:**

2024-C-01492     DARLENE WARD PELLECER, INDIVIDUALLY AND AS THE ADMINISTRATOR OF THE ESTATE OF CARLOS F. PELLECER, AND CYNTHIA PELLECER KEPPLER, LINDA PELLECER SEWARD, AND BONNIE PELLECER PEREZ  VS.  WERNER CO., A CORPORATION OF DELAWARE, ET AL. (Parish of Orleans Civil)

COURT OF APPEAL REVERSED, TRIAL COURT JUDGMENT VACATED, AND RENDERED. SEE OPINION.

Hughes, J., dissents and assigns reasons.

SUPREME COURT OF LOUISIANA

No. 2024-C-01492

DARLENE WARD PELLECER, INDIVIDUALLY AND AS THE
ADMINISTRATOR OF THE ESTATE OF CARLOS F. PELLECER, AND
CYNTHIA PELLECER KEPPLER, LINDA PELLECER SEWARD, AND
BONNIE PELLECER PEREZ

VS.

WERNER CO., A CORPORATION OF DELAWARE, ET AL.

On Writ of Certiorari to the Court of Appeal, Fourth Circuit, Parish of Orleans

GUIDRY, J.

This case presents a claim under the Louisiana Products Liability Act. After falling from an allegedly defective ladder, Carlos Pellecer suffered a fatal injury. At the time of Mr. Pellecer's injury, the manufacturer of the ladder, a company formerly known as Werner Co., a Pennsylvania corporation, had sold a significant portion of its assets in bankruptcy to Werner Co., a Delaware corporation, and New Werner Holding Co., Inc. (together, defendants).

The question presented here is whether the defendants are manufacturers of the ladder. We granted review to address, specifically, whether the defendants labeled the subject ladder as their own or otherwise held themselves out to be the manufacturer of the ladder. *See* La. R.S. 9:2800.53(1)(a). Having considered the testimony and evidence presented, we find no liability for the defendants under the Louisiana Products Liability Act. Accordingly, and for the reasons that follow, we reverse the appellate court's judgment, vacate the judgment rendered on the jury verdict, and render judgment in favor of the defendants.

## FACTS AND PROCEDURAL HISTORY

In November 2019, Carlos Pellecer was working as a handyman, replacing an outdoor light at a home in New Orleans, when he fell from an aluminum extension Werner brand ladder. Mr. Pellecer died two days later as a result of the injuries sustained from the fall. Following Mr. Pellecer's death, his widow and children, plaintiffs herein,[1] filed suit against multiple parties, including the defendants, Werner Co., a Delaware corporation (Werner Delaware), and New Werner Holding Co., Inc. (New Werner). The plaintiffs alleged the extension ladder was unreasonably dangerous for its anticipated use pursuant to the Louisiana Products Liability Act, La. R.S. 9:2800.51, *et. seq.* (hereinafter sometimes referred to as "the LPLA" or "the Act"). The plaintiffs further claimed the defendants failed to act as prudent manufacturers during a 2018 recall of 78,000 aluminum ladders, by failing to warn Mr. Pellecer to stop using his ladder.

In November 2021, the defendants moved for summary judgment. In their motion, the defendants argued they were not the manufacturers of the ladder used by Mr. Pellecer, as Mr. Pellecer's ladder was manufactured by Werner Co., a Pennsylvania corporation, which changed its name to "Old Ladder" (Werner PA/Old Ladder). The trial court denied the defendants' motion for summary judgment and writs were denied by the court of appeal and this court. *See Pellecer v. Werner Co.*, 21-0702 (La. App. 4 Cir. 12/8/21) (unpublished writ action); *Pellecer v. Werner Co.*, 22-00048 (La. 3/20/22), 333 So.3d 834.

The case proceeded to a five-day jury trial. Multiple witnesses testified. No one witnessed the accident. According to the evidence, at the time of the accident, the ladder was fully extended, resting against an upstairs balcony of a house as Mr. Pellecer was attempting to change a light. A window on the side of the house was

---

[1] The plaintiffs are Darlene Ward Pellecer, individually and as the administrator of the estate of Carlos F. Pellecer, Cynthia Pellecer Keppler, Linda Pellecer Seward, and Bonnie Pellecer Perez.

broken as the ladder fell to the ground. The plaintiffs claim the side rail of the ladder fractured or failed, causing the ladder to fall. According to the plaintiffs' expert, Dr. Jahan Rasty, an anomaly existed at the point where the fracture occurred. The defendants, however, espoused a different theory. According to the defendants, the damage to the ladder, including the crack in the side rail, occurred as the ladder fell to the ground. The accident happened when the legs of the ladder, which were placed on concrete, "slipped out."

New Orleans Emergency Medical Services arrived on the scene at 6:05 p.m. and found Mr. Pellecer on the ground unresponsive. While there is no dispute Mr. Pellecer was using a Werner brand ladder at the time of the accident (model C378 Mark 9), the defendants deny being the manufacturers, maintaining the ladder was manufactured in 1991 by Old Ladder, which filed for bankruptcy in 2006.

As stated by Geoffrey Hartenstein, who worked as counsel for both Old Ladder and Werner Delaware,[2] New Werner Holding Co., the parent company of Werner Delaware, incorporated in March 2007 to purchase certain assets in the Old Ladder bankruptcy proceeding, including the Werner name, trademark, and goodwill, which was accomplished through an asset purchase agreement approved by the bankruptcy court that same year. Thereafter, Werner Delaware was formed to operate the business using the purchased assets. As Mr. Hartenstein explained without contradiction, although some executive officers and employees stayed on after the bankruptcy, there were no similar owners or board members between the defendants and Old Ladder. The new company, Werner Delaware, obtained new bank accounts and tax ID numbers and advised its customers and suppliers that a new company had been created.

---

[2] Mr. Hartenstein was Werner Delaware's executive vice president, secretary, and general counsel from 2007 to 2022, and Old Ladder's corporate counsel from 1994 to 2007.

The Werner trademark was not changed, and the defendants kept the Werner name because its brand was well respected. Mr. Hartenstein explained that the asset purchase agreement limited the defendants' claims in products liability to those existing before the agreement's closing date and excluded claims arising thereafter. The asset purchase agreement further provided that the bankrupt corporation, Werner PA, would change its corporate name to Old Ladder to avoid confusion.

Additionally, the defendants' senior advanced development engineer, Dale King, who had also previously worked for Old Ladder, testified and confirmed that Mr. Pellecer's ladder was a model C378 Mark 9, with a Werner brand logo.[3] Date stamps indicated the ladder's front and back sections were manufactured separately, a normal practice, in June and November of 1991. Old Ladder manufactured and sold Mark 9 ladders from 1982 until 2002, when a newer model ladder, the Mark 10, was introduced. According to Mr. King, there was a system to "force out the inventory," including a system to "clockwise bays down." The new Mark 10 ladders could not be shipped until the Mark 9 ladders were gone. As of 2002, the Mark 10 ladder was produced and began shipping. The defendants never sold or manufactured the Mark 9 ladder, and there were no recalls for or other issues with the Mark 9 ladder during the twenty years the ladder was in production. The 2018 recall referenced by the plaintiffs involved different model Werner brand ladders.

The plaintiffs' marketing and branding expert, Joe Ricks, Jr., testified that the defendants "absolutely" held themselves out as the manufacturers of Mr. Pellecer's ladder. According to Mr. Ricks, the Werner brand logo had been slightly updated (in 2012), but essentially remained the same. Mr. Ricks explained that the defendants continued to use the Werner brand logo after acquiring it, without marketing, advertisements, or announcements to educate the public of the change in ownership.

---

[3] Mr. King was qualified as an expert witness in the fields of ladder design, manufacturing, testing, quality control, and failure analysis.

According to Mr. Ricks, the defendants wanted the general public to believe "everything [was] the same."

Mr. Pellecer's daughter testified that after Hurricane Katrina, which occurred in August 2005, Mr. Pellecer replaced all of his tools, including his ladders. The exact date Mr. Pellecer purchased his ladder and from whom he purchased it were not established.

The jury determined the defendants were the manufacturers of the ladder; the defendants labeled or held the ladder out as their own at the time Mr. Pellecer purchased the ladder; the ladder was defective at the time it left the defendants' control; Mr. Pellecer's death was proximately caused by an unreasonably dangerous characteristic of the ladder; and Mr. Pellecer was not negligent. The jury also determined that Old Ladder manufactured the ladder involved in the accident. The jury awarded the plaintiffs $5,036,012.00 in damages and determined that the defendants and Old Ladder were each 50% at fault.[4]

The defendants filed a motion for judgment notwithstanding the verdict, or in the alternative, a motion for new trial. In their motion, the defendants asserted among other arguments, that they were not the manufacturers of the ladder and never marketed, sold, or otherwise handled the subject ladder. The defendants' motion was ultimately denied.[5] The trial court entered judgment on the jury's verdict. The court of appeal affirmed the trial court's judgment, finding it within the jury's province, pursuant to the LPLA, to conclude that the defendants were the manufacturers of the ladder. *Pellecer v. Werner Co.*, 23-0694 (La. App. 4 Cir. 10/16/24), 414 So.3d 554. This court granted the defendants' writ application. *Pellecer v. Werner Co.*, 24-01492 (La. 4/1/25), 403 So.3d 597.

---

[4] Old Ladder was not a party in this litigation.

[5] At the close of the plaintiffs' case-in-chief, the defendants filed a motion for directed verdict, which was also denied.

# DISCUSSION

This matter raises the threshold question of whether the defendants are manufacturers under the LPLA, which establishes the exclusive theories of liability for manufacturers for damage caused by their products. *See* La. R.S. 9:2800.52. A manufacturer of a product shall be liable to a claimant for damage proximately caused by an unreasonably dangerous product when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity. La. R.S. 9:2800.54. A "manufacturer" is defined by the LPLA as follows:

> (1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:
>
> (a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
>
> (b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
>
> (c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
>
> (d) A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer. … .

La. R.S. 9:2800.53(1).

Thus, in addition to the entity that actually manufactures the product, one "who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product" is also considered a manufacturer. La. R.S. 9:2800.53(1)(a). Referred to as the apparent manufacturer doctrine, this provision allows a plaintiff to hold a seller or distributor liable for injuries caused by a product when the seller leads a reasonable consumer to believe it is the manufacturer of the product. *Martin v. Pham Le Bros., LLC*, 21-159, p. 9 (La. App. 5 Cir. 9/22/21), 330

So.3d 346, 352, *citing Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 895 (5th Cir. 2010).

The plaintiffs contend the defendants are liable as apparent manufacturers. The defendants, however, assert that they are not the manufacturers of the product and cannot be held liable as apparent manufacturers. We apply the well-established rules of statutory construction to determine whether the defendants are manufacturers under La. R.S. 9:2800.53(1)(a), as the interpretation of any statutory provision starts with the language of the statute itself. *See Oubre v. Louisiana Citizens Fair Plan*, 11-0097, p. 11 (La. 12/16/11), 79 So.3d 987, 997.

Absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language. La. C.C. art. 9; La. R.S. 1:4; *Cleco Evangeline, LLC v. Louisiana Tax Commission*, 01-2162, p. 5 (La. 4/3/02), 813 So.2d 351, 354. Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. La. R.S. 1:3. In determining the meaning of a word, phrase, or clause, the entire statute is to be considered. *Luv N' Care, Ltd. v. Jackel International Limited*, 19-0749, p. 9 (La. 1/29/20), 347 So.3d 572, 578. The meaning and intent of a law is determined by a consideration of the law in its entirety and all other laws on the same subject matter, and the court's construction should be placed on the provision in question which is consistent with the express terms of law and with the obvious intent of the lawmaker in enacting it. *Richard v. Hall*, 03-1488, p. 27 (La. 4/23/04), 874 So.2d 131, 151.

Considering the foregoing principles, when we examine the entirety of the LPLA, we conclude that the evidence before us is insufficient to hold the defendants liable as manufacturers. In making our determination, we are reminded that conduct or circumstances that result in liability within the context of the LPLA are "fault"

within the meaning of La. C.C. art. 2315.[6]  *See* La. R.S. 9:2800.52.  We are also guided by not only the plain language of the Act, but the jurisprudence giving rise to it, which relies and rests upon the Restatement (Second) of Torts §400 (1965): One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.

Notably, prior to the enactment of the LPLA, in *Penn v. Inferno Manufacturing Corporation,*199 So.2d 210 (La. App. 1 Cir.), *writ refused,* 251 La. 27, 202 So.2d 649 (1967), when the plaintiff sued Inferno Manufacturing Corporation, believing Inferno manufactured a sight glass that exploded during an oil well testing operation, the court found Inferno jointly liable with the entity later revealed to be the manufacturer.  The evidence showed that Inferno attached its label to the sight glass such that an observer would not know that anyone other than Inferno had manufactured the part.  The box containing the sight glass was also labeled "Inferno Company."  The court held that Inferno was liable because it labeled the sight glass as its own, thus holding itself out as the manufacturer.  *Penn*, 199 So.2d at 214-15.  The *Penn* court reasoned that where the vendor puts only its name upon the product without indicating it is actually the product of another, the public is induced by its reasonable belief that it is the product of the vendor.  *Penn*, 199 So.2d at 215.

Thereafter, in *Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc.,* 262 La. 80, 262 So.2d 377 (1972), drawing upon *Penn*, *supra*, this

---

[6] Article 2315 provides, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

We note that Louisiana embraces a broad civilian concept of fault that encompasses any conduct falling below a proper standard.  *See Landry v. Bellanger,* 02-1443, p. 6 (La. 5/20/03), 851 So.2d 943, 949.  Fault within La. C.C. art. 2315 also "goes to the many other articles in our Code … which deal with the responsibility of certain persons, the responsibility in certain relationships, and the responsibility which arises due to certain types of activities." *Langlois v. Allied Chemical Corp.*, 258 La. 1067, 1077, 249 So.2d 133, 137 (1971) (superseded by statute on other grounds).

court held an American Mercedes-Benz distributor liable as a manufacturer because the evidence indicated the distributor led its consumers to believe it was the manufacturer. The determination was based on the fact that the distributor had exclusive rights to market the cars domestically, and for selling, servicing and establishing franchise dealerships. The distributor also included its name in the owner's manuals and service policies provided to purchasers of the vehicles. *Media Production Consultants, Inc.*, 262 La. at 89, 262 So.2d at 380. We held, "Insofar as the American consumer is concerned, [the distributor] occupies the position of the manufacturer." *Media Production Consultants, Inc.*, 262 La. at 89, 262 So.2d at 380. Similarly, in *Chappuis v. Sears Roebuck & Co.*, 358 So.2d 926, 930 (La. 1978), we held that the responsibility of Sears was the same as that of the manufacturer because Sears held the product out to the public as its own. *Chappuis* involved a defective hammer that bore the Sears' name and "craftsman" mark with no indication of the actual manufacturer, which was another company. *Chappuis*, 358 So.2d at 928-29. This court found Sears liable stating, "[T]he failure to inform the user of the danger is fault referred to in C.C. [art.] 2315. … the liability to Chappuis is fixed by C.C. [art.] 2315, if he shows the failure to act causes damage to him." *Chappuis*, 358 So.2d at 929-30.

We observe that earlier jurisprudence somewhat limited the scope of the apparent manufacturer doctrine. Since *Chappius,* however, and with the enactment of the LPLA, the apparent manufacturer doctrine has expanded beyond those circumstances in which the product itself provided indication that the seller may be the manufacturer. For example, in *Peterson v. G.H. Bass & Co.*, 97-2843, p. 3 (La. App. 4 Cir.1998), 713 So.2d 806, 808, *writ denied*, 98-1645 (La. 10/16/98) 727 So.2d 441, the seller of shoe care products held itself out as the manufacturer under the LPLA. Although labels stated in fine print on the back of product cans that the products were "Manufactured for [seller]," the seller was nevertheless identified in

large bold print by labels on the front of product cans. Two witnesses testified that they remembered very little about the products' labels except that the labels identified the seller as the maker. *Peterson*, 97-2843 at 3, 713 So.2d at 808. In *Allstate Insurance Co. v. Fred's, Inc.*, 44,508, p. 15 (La. App. 2 Cir. 3/17/10), 33 So.3d 976, 985, *writ denied*, 10-0883 (La. 6/18/10), 38 So.3d 331, a seller of a lamp also held itself out as the manufacturer. Therein, the lamp was labeled, "Made in China." However, the court opined that another label on the lamp stating, "Distributed by Seller," left open the possibility of the seller's involvement in some capacity with the product as it was produced in China. *Allstate Insurance Co., Inc.*, 44,508 at 14, 33 So.3d at 984.

Beyond product labeling, courts have considered marketing materials and guarantees, such that in *Martin*, the court concluded that a catalog not included with a product at the point of sale and not seen by the purchaser prior to the sale was not relevant in determining whether the seller held itself out as the manufacturer. *Martin*, 21-159 at 18, 330 So.3d at 358. The court emphasized that the determination of whether a seller is an apparent manufacturer is based on the viewpoint of the purchasing public and the circumstances at the time of purchase. *Martin*, 21-159 at 9, 330 So.3d at 352-53.

Courts have also considered whether the product itself left the consumer with the impression that the seller was the manufacturer. In *Coulon*, Walmart either contracted with a separate entity to assemble a bicycle or had a Walmart employee assemble the bicycle. The court stated, "Assuming [a separate entity] actually assembled the bicycle, Walmart admittedly did not give any notice to its customers ... that a separate entity assembled the [bike]." Therefore, Walmart held itself out as the manufacturer of the bike. *Coulon v. Wal-Mart Stores, Inc.*, 98-1141, p. 6 (La. App. 1 Cir. 5/14/99), 734 So.2d 916, 920, *writ denied*, 99-1720 (La. 9/24/99) 747 So.2d 1125. *Chevron* involved defective bolts. Although the distributor did not

manufacture the bolts and the bolts did not include the distributor's name or mark but the mark of the manufacturer, the court determined that the jury did not err in holding the distributor liable as a manufacturer because the distributor was "well-known as a bolt manufacturer," the packing slip accompanying the bolts possibly suggested the bolts were manufactured by the distributor, and the distributor did not inform its customer that the bolts it sold were not its own. *Chevron*, 604 F.3d at 890, 898.

That is not to say we are inclined to expand the subject doctrine and statutory definition of a manufacturer here. To the contrary, as expressed in John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. Law Rev. 565, 572 (1989), we agree that in order to be a manufacturer under the LPLA one must do something to the product that influences it in a significant way. A seller is a manufacturer even if the seller has not otherwise modified the product or influenced one of its characteristics because the seller, by his own actions, has suggested that he is responsible for the product's nature, and as a result has induced the consumer, reasonably, to rely on that assertion in purchasing the product. Kennedy, 49 La. Law Rev. at 574. A review of cases makes clear that when a seller's actions give the buying public a basis to assume it may be the manufacturer of the product it distributes, the seller may be liable.[7]

With this legal framework in mind, we now turn to the defendants, who are not the actual manufacturers of the subject ladder, and for which there is no evidence suggesting the defendants ever sold or distributed the ladder. There is also no evidence the defendants had input into the design of the ladder or ever had any control over either the construction or quality of the ladder.

---

[7] We point to this court's recent decision in *Pickard v. Amazon.com, Inc.*, 23-01596 (La. 6/28/24) 387 So.3d 515, holding that Amazon was a seller and could be considered a manufacturer under the LPLA when it had physical custody of third-party products in its distribution warehouse and controlled the transaction and delivery process through its fulfillment program.

The defendants did not label the ladder, as that would require some affirmative act on the part of the defendants, marking the ladder as their own. *See Allstate Insurance Co., Inc.*, 44,508 at 14-15, 33 So.3d at 984-85; *Peterson*, 97-2843 at 3, 713 So.2d at 808. Importantly, the defendants are not the alter ego or successors of Old Ladder. As found by the bankruptcy court in that proceeding, the asset purchase agreement was negotiated without collusion or fraud, and in good faith:

> *Buyer [Defendants are] not an insider or affiliate of any of the Debtors [Werner PA/Old Ladder]*, as those terms are defined in the Bankruptcy Code, and *no common identity of incorporators, directors, or stockholders existed between Buyer and any of the Debtors*. Pursuant to the Purchase Agreement, Buyer is not purchasing all of the Debtor's assets in that Buyer is not purchasing any of the Excluded Assets, and Buyer is not holding itself out to the public as a continuation of the Debtors. Those of the Debtors' employees who are to be employed by Buyer … are being hired under new employment contracts … *there is not substantial continuity between Buyer and the Debtors*, there is no continuity of enterprise between the Debtors and Buyer, Buyer is not a mere continuation of the Debtors … *and Buyer does not constitute a successor to the Debtors or the Debtors' estates*. [Emphasis added.]

Further, we find no evidence that the subject Mark 9 ladder was ever recalled by the defendants, or by Old Ladder, for that matter. The defendants assumed no responsibility for the ladder, and we see no way in which the defendants held themselves out as manufacturers of the ladder.

At the time of the asset purchase in 2007, the Mark 9 ladder was no longer being produced, and based on the undisputed testimony of Mr. King, was seemingly out of inventory. Nothing establishes that the *defendants* "put out" or held out as their own the Mark 9 ladder. While a date and source of purchase is relevant in deciding if the defendants can be considered apparent manufacturers, even the court of appeal acknowledged in its opinion that "[e]xactly when Mr. Pellecer purchased the ladder, and from what source, was never established."[8]

---

[8] We do not suggest that the ladder had to be purchased in order for the plaintiffs to obtain relief under the LPLA. We do, however, emphasize that in this matter a date of purchase or acquisition along with an identification of the source of purchase or acquisition would assist the court in determining whether the defendants put out the ladder as their own product.

In other words, that the defendants acquired the name and trademark as found on Mr. Pellecer's Mark 9 ladder does not render the defendants manufacturers under these circumstances alone. It is the actor's action that gives the buying public a basis to assume it may be the manufacturer of a product. *See generally Martin*, 21-159 at 12, 330 So.3d at 354. And, in accordance with the purpose and the text of the LPLA, we conclude that such action, in holding oneself out to be the manufacturer of the product, necessarily includes a level of engagement in the process of manufacturing or distributing the product, or a level of control of or influence over the subject product. We reiterate our view expressed herein that in order to be a manufacturer under the Act one must do something to or with the product that affects it in a meaningful way. We are unable to find any such action by the defendants here, and find no basis to deem the defendants liable.

Although the plaintiffs seek to hold the defendants liable under the apparent manufacturer doctrine, the statutory requirements of the "manufacturer" definition have not been met. *See* La. R.S. 9:2800.52; 9:2800.53(1). We are not without sympathy for the plaintiffs. We cannot, however, impose liability beyond the boundaries of the Act. To the extent the jury determined otherwise, we conclude the jury manifestly erred.[9] The trial court additionally erred, as it denied the defendants' motion for JNOV.

We hold juries in high regard and accord them great deference in their decisions. However, when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not

---

[9] Although deference to the factfinder should be accorded, because appellate courts have a constitutional duty to review both law and facts, they have the right and the obligation to determine whether a trial court verdict is clearly wrong based on the evidence, or clearly without evidentiary support. *Brewer v. J.B. Hunt Transport, Inc.*, 09-1408, p. 13 (La. 3/16/10), 35 So.3d 230, 240, *citing Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, p. 8 (La. 7/5/94), 639 So.2d 216, 221. Application of the law to the facts of this case demonstrates that finding the defendants liable has no legal or factual basis.

arrive at a contrary verdict, as they do here, JNOV is warranted. *See* La. C.C.P. art. 1811; *Eastman v. State Farm Mutual Automobile Insurance Co.*, 23-01107, pp. 8-9 (La. 5/10/24), 384 So.3d 865, 872, *citing Joseph v. Broussard Rice Mill, Inc.*, 00-00628, p. 5 (La. 10/30/00), 772 So.2d 94, 99. We reach no other issues.

## CONCLUSION

For the foregoing reasons, we find the trial court erred in denying the defendants' JNOV, as did the court of appeal in affirming the trial court's judgment. We reverse the court of appeal, vacate the judgment rendered on the jury verdict, and render judgment in favor of the defendants, granting the motion for judgment notwithstanding the verdict.

**COURT OF APPEAL JUDGMENT REVERSED, TRIAL COURT JUDGMENT VACATED, AND RENDERED.**

# SUPREME COURT OF LOUISIANA

## NO. 2024-C-01492

## DARLENE WARD PELLECER, INDIVIDUALLY AND AS THE ADMINISTRATOR OF THE ESTATE OF CARLOS F. PELLECER, AND CYNTHIA PELLECER KEPPLER, LINDA PELLECER SEWARD, AND BONNIE PELLECER PEREZ

## VERSUS

## WERNER CO., A CORPORATION OF DELAWARE, ET AL.

On Writ of Certiorari to the Court of Appeal, Fourth Circuit, Parish of Orleans

**Hughes, J., dissents.**

The Opinion follows the trend of lauding juries that return low verdicts while determining that a high verdict rendered by a jury must be questioned, and employs judicial activism to negate the jury verdict rendered in this case.

The law defines a "manufacturer" as "a person or entity who labels a product as his own or *otherwise holds himself out* to be the manufacturer of the product." (emphasis added)

To the law as written the Opinion adds the gloss that "one must do something to or with the product that affects it in a meaningful way" in order to be a manufacturer. This is new language, not the words of the Legislature.

Let's be realistic. The new entity did not name itself "Jones Ladder Company". It used the Werner name to hold itself out to the public as the manufacturer of the traditional Werner ladders. This was the "actor's actions", holding itself out, not physically tinkering with the ladder.

The jury as finder of fact in this case determined defendant Werner Co. to be a manufacturer. I respectfully dissent and would affirm the jury and the Court of Appeal.